### MARCONI WIRELESS TELEGRAPH CO. OF AMERICA v. KILBOURNE & CLARK MFG. CO.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1920.)

No. 3132.

1. Patents ⊛174—Claims for wireless improvement held not entitled to broad construction as pioneer.

Claims. for improvement, in wireless apparatus, consisting chiefly of means for securing electrical resonance between the circuits in both the receiving and transmitting sets, is not, in view of the prior patents of the same inventor and disclosures by him and others, entitled to broad construction and a wide range of equivalents as a pioneer invention.

2. Patents ⊛248—Infringement of expired patent cannot infringe subsequent patent, unless containing element not in former.

A device which admittedly infringed an expired patent cannot infringe a subsequent patent, unless it contains some element covered by the subsequent patent, which was not included in the expired patent.

3. Patents ⊛328—763,772 for resonant oscillation in wireless apparatus, held not infringed.

The claims of the Marconi patent, No. 763,772, for wireless transmitting and receiving sets, each having primary and secondary circuits, which can be adjusted to oscillate in resonance with the other circuit in the same instrument and with the circuits in the other instrument, held not infringed by the Simpson and Thompson transmitters and the standard receiver, which can only be adjusted to secure resonance between the antennæ circuits of the two instruments.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit by the Marconi Wireless Telegraph Company of America against the Kilbourne & Clark Manufacturing Company to restrain infringement of patents and for damages. From a decree finding. infringement of expired patent, but not of the existing patent (239 Fed. 328), plaintiff appeals. Affirmed, except as to the charge of infringement relating to apparatus sold to the Navy Department, which was withdrawn from the case by agreement of counsel.

See, also, 235 Fed. 719.

The suit as filed involved claims 1, 2, and 5 of letters patent No. 609,154, dated August 16, 1898, issued to Oliver Lodge, for improvements in electric telegraphy, expired August 16, 1915; also claims 1, 2, 3, 6, 8, 10, 11, 12, 13 14, 16, 17, 18, 19, and 20 of letters patent No. 763,772, dated June 28, 1904, issued to Guglielmo Marconi, for improvements in apparatus for wireless telegraphy.

E. C. Hughes, of Seattle, Wash., L. F. H. Betts, J. Edgar Bull, and James J. Cosgrove, all of New York City, and Samuel Knight, · of San Francisco, Cal., for appellant.

E. L. Skeel and Donworth & Todd, all of Seattle, Wash., Philip Farnsworth and George F. Scull, both of New York City, and Roberts, Wilson & Skeel and Lee Johnston, all of Seattle, Wash., for appellee.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MORROW, Circuit Judge. This is an appeal by the plaintiff and a cross-appeal by the defendant from the final decree entered July 16, 1917, in the District Court of the Western District of Washington, Northern Division. The decree sustains claims 1, 2, and 5 of letters patent No. 609,154, dated August 16, 1898, and issued to Oliver Lodge, for improvements in electric telegraphy. The court held that the defendant had infringed the same by manufacturing and selling apparatus employing the invention thereof, but no injunction was granted restraining the infringement, as the patent had expired August 16, 1915, and no accounting of profits and damages was ordered, as a settlement had been made between the parties. The defendant admitted the infringement of these claims of the lodge patent, but denied their validity. The court sustained their validity. No appeal has been taken by either party from this part of the decree. It has therefore become final.

The decree also sustains the validity of claims 1, 2, 3, 6, 8, 10, 11, 12, 13, 14, 16, 17, 18, 19, and 20 of letters patent No. 763,722, dated June 28, 1904, to Guglielmo Marconi, for improvements in apparatus for wireless telegraphy, but holds the defendant's apparatus, known as the Simpson transmitter, the Thompson transmitter, and its standard receiver, had not infringed any of these claims. In addition the decree holds that, in view of the act of Congress of June 25, 1910, entitled "An act to provide additional protection for owners of patents of the United States, and for other purposes" (36 Stat. 851 [Comp. St. § 9465]) the court had no jurisdiction to grant the prayer of the bill of complaint for an injunction or accounting in respect to defendant's apparatus, such as was found installed on the steamship Achilles and alleged to have been sold by the defendant to the United States.

The decree therefore dismissed the bill so far as it prayed for an injunction and accounting in respect to such apparatus. The plaintiff has appealed from the finding of noninfringement of the claims of the Marconi patent, from the finding of lack of jurisdiction in respect to the Achilles apparatus, and from the lack of finding in respect to infringement by such apparatus of the claims of the Marconi patent. The defendant has taken a cross-appeal in respect to the finding of the validity of the claims of the Marconi patent, in view of the prior art. In this court it was stated that the Marconi Company had received a request from the Navy Department of the United States to join with counsel for the defendant to withdraw from the consideration of this appeal certain apparatus sold by the defendant to the Navy Department, and to remand that question of infringement to the District Court, leaving the question of costs in this court and in the court below for future consideration. The Marconi Company joined in that request. The judgment of this court will take note of this request in its mandate.

The defendant having settled with the plaintiff for the infringement of the lodge patent, No. 609,154, for the period prior to its expiration of August 16, 1915, we have nothing to do with that patent, except possibly in its relation to the prior art. The only question then remaining for this court to determine relates to the validity and in-

fringement by the defendant of the Marconi patent, No. 763,772, by the manufacture and sale by the defendant of two certain forms of commercial transmitting apparatus, described and known as the Simpson and Thompson transmitters and a receiving apparatus known as a standard receiver.

Counsel for the defendant in their concluding argument stated that they did not find it necessary to depend upon the validity of the Marconi patent for a defense. They placed it upon the claim of noninfringement of the invention as limited by the prior art, sanctioned by judicial construction. This means that they claim that the elimination from the apparatus in suit of all elements described in prior improvements and inventions in wireless telegraphy and open to the public at the time of the alleged infringement will leave the defendant's apparatus free from the charge of infringement, so that it is immaterial whether the particular improvement in this patent was invention or not. The oral argument in this court presented the case in an able and interesting manner, and we think we may, with some emphasis, acknowledge our appreciation of a paragraph in the opening statement of one of the counsel for plaintiff in which he says:

"The subject-matter of this controversy relates to an extremely difficult branch of an obscure art. The experts are talking about things which are unseen, or things which are seen only with the eye of scientific faith, and they are talking in a language which is worse than Greek to most lawyers. In such a case, it is very easy to lead to mystification and confusion. How can a court, which is composed of mere lawyers, and not of electricians, decide disputes between wireless experts as to the facts, without an enormous amount of labor—without a prohibitive amount of labor? I declare I do not know."

He followed this remark with the promise that he would endeavor to diminish our labors to a minimum by an argument of the case wholly on facts not in dispute, with one single exception. There appears to have been a commendable effort on the part of all the counsel in the case to make the issues perfectly plain to the court, but the difficulty remains for the court to make clear, in a new and technical language and without too much detail, what we understand to be the mechanism and operation of an apparatus designed to deal with, control, and direct the movement of this elusive and unseen element of electricity, bearing in mind that it is not the end or result to be accomplished that is patentable, but the discovery or invention of a practicable method or means for producing a new and useful result in communicating electrical signals without wires. With this line of investigation clearly marked out before us, we proceed to examine the elements of the apparatus described in the patent and claimed as an invention.

The movement of electricity and the devices in controversy relating thereto are all profusely illustrated by figures, diagrams, and charts in the evidence and in the briefs before us; but we do not think it practicable to reproduce in this opinion any of these figures or illustrations. The reproduction of any would require the substantial reproduction of all, and this cannot be done within the reasonable limits of the opinion. With a few elementary definitions and explana-

tions, we hope to make the discussions as plain as the nature of the case will permit.

A current of electricity may flow continuously in one direction, or it may flow alternately in opposite directions, and it may flow alternately in opposite directions with extreme rapidity or frequency. The first is referred to as a continuous current, the second as an alternating current, and the third as an oscillating current. In the patent in suit we are dealing with an apparatus employed in producing an oscillating current.

In the application for the patent in suit Marconi declares that he had "invented certain new and useful improvements in the apparatus for wireless telegraphy," for which he specifies that the invention "relates to apparatus for communicating electrical signals without wires and by means of Hertzian oscillations or electric waves; and the object of the invention," he says, "is to increase the efficiency of the system and to provide new and simple means whereby oscillations or electric waves from the transmitting station might be localized when desired at any one selected receiving station or stations out of a group of several receiving stations." This specification informs the public that Marconi's invention relates to new and useful improvements in apparatus for wireless telegraphy, and that the object is to increase the efficiency of that system. It is therefore not an original invention of a pioneer apparatus for wireless telegraphy, but it consists in improvements on such an apparatus, and the object is to increase the efficiency of a system already in existence and in use. Its relation to a prior improvement and invention is stated and disclosed by the further provisions in the specification, in which it is explained by Mr. Marconi that in his "prior United States patent, No. 586,193 (reissue No. 11,913, dated June 4, 1901)" he has "shown and described the combination at a transmitting station of an oscillation producer, such as an induction coil, having one end of its secondary coil connected to one contact of a spark producer and to the earth, and having the other end of the said secondary connected to the opposite contact of the spark producer and to a vertical wire or elevated plate," and he had further "shown at a receiving station an imperfect contact connected in circuit with a vertical receiving wire and with the earth." The original patent and its reissue, like the patent in suit, were for "new and useful improvements in transmitting electrical impulses and signals."

The reissued patent, No. 11,913, dated June 4, 1901, was for the unexpired term of an original patent, No. 586,183, dated July 13, 1897. The original patent and its reissue expired July 13, 1914. This reference to the prior patent and its reissue is therefore not for the purpose of claiming in this suit an infringement of the invention or improvement contained in that patent or its reissue, but to fix a point of departure for the identification of the improvements in apparatus claimed as invention in the patent in suit. Mr. Marconi says:

"According to the present invention"—that is to say, the invention described in the patent in suit—"the system includes at the transmitting station the combination with an oscillation transformer of a kind suitable for the trans-

formation of very rapidly alternating currents of a persistent oscillator and a good radiator, one coil of said transformer being connected between the aerial wire or plate and the connection thereof to earth, while the other coil of the transformer is connected in circuit with a condenser, a producer of Hertzian oscillations or electric waves, shown in the form of a spark producer and an induction coil (constituting the persistent oscillator) controlled by a signaling instrument."

This specification discloses the fact that both the original patent, No. 586,183, its reissue, No. 11,913, and the patent in suit, No. 763,-772, are dealing with the production of oscillations or electrical waves, which we are told by scientists are transmitted through the universal medium of the ether at the speed of light waves, namely, 186,000 miles per second of time, and that these electric waves are produced by electrical discharges causing disturbances in the ether, which, being regulated and controlled by suitable apparatus, carry signals to a distance. In the earlier patent the main feature of the apparatus there described is called "oscillation producer," and in the latter patent a "persistent oscillator."

Mr. Marconi, in his application for the patent in suit, further specifies that—

"The complete system also includes at a receiving station an oscillation transformer, one coil whereof is included in the aerial receiving wire and earth, consisting of a good absorber of electrical oscillations, while a device responsive to electric waves, such as an imperfect contact, or a device for controlling the same, is included in a circuit with the other coil of said transformer. The system also requires as essential elements thereof the inclusion in the lines (at both stations) from the aerial conductor to the earth of variable inductances and the use at both stations of improvements for varying or adjusting the inductance of the two circuits at each station to accord with each other."

By this arrangement of apparatus he says he is able to secure the perfect "tuning" of the apparatus at a transmitting station and at one or more of a number of receiving stations. In the accompanying drawings the arrangement of the apparatus is shown diagrammatically at the transmitting and receiving stations—the preferred form of transformer at the transmitting station and the forms of transformers at the receiving station. The parts of the apparatus at the transmitting and receiving station are also illustrated. In referring to these diagrams, the identifying letters and numbers will be omitted, as they cannot be made serviceable in this opinion.

Mr. Marconi says:

"The transmitting station is provided under my present invention with a source of current electrically connected in circuit with the primary of an induction coil and with a circuit-closing key, or otherwise controlled by a signaling instrument."

"In the secondary circuit of said induction coil the sphereal terminals or other contacts of a spark producer or other electric wave or oscillation producer are included with a shunt therefrom in which shunt is included the primary coil of an oscillation transformer. A condenser, preferably one provided with two telescoping metallic tubes, separated by a dielective and arranged to readily vary the capacity by being slid upon each other is included in one connection from the induction coil to the transformer winding. The secondary coil of the transformer is connected (at one end) to the earth and at the other end to a vertical wire or an elevated plate."

This last is the open circuit, with its aerial wire or plate, Mr. Marconi makes this statement:

"It is obvious," he says "that instead of the induction coil and associated parts for producing the electric waves or oscillations I may use any other proper means for producing such waves or oscillations—such, for instance, as a generator of alternating electric currents."

The use of "any other means" is of course limited by the terms of the patent.

Mr. Marconi states that the illustrated arrangement of parts at a transmitting station enables much more energy to be imparted to the radiator. In explanation of this statement he says that the "approximately closed circuit of the primary is a good conserver, and the open circuit of the secondary is a good radiator, of wave energy." He is here referring to the primary and secondary circuits at the transmitting station. He says further that his "experiments have demonstrated that the best results are obtained at the transmitting station" when he uses "a persistent oscillator." He had previously stated that the improvement in apparatus claimed by him as invention included at the transmitting station the combination with an oscillaion transformer of a kind suitable for the transformation of very rapidly alternating currents of a persistent oscillator and a good radiator. This oscillation transformer included in the "persistent oscillator" is connected in the primary circuit with a condenser, a spark producer and an induction coil.

It is clear from this statement that the "persistent oscillator" of the primary or closed circuit and the "good radiator" of the secondary or open circuit are the important features in Mr. Marconi's improvement or invention. How do they operate, and for what purpose? He says:

"The persistent oscillator" is "an electrical circuit of such a character that, if electromotive force is suddenly applied to it and the current then cut off, electrical oscillations are set up in the circuit, which persist or are maintained for a long time."

This is the primary circuit of the transmitting station. The good radiator is the conductor of "an electrical current which very quickly imparts the energy of electrical oscillations to the surrounding ether in the form of waves." This is an element of the secondary circuit of the transmitting station. "In operation," he says, "the signal key is pressed and this closes the primary of the induction coil. The current then rushes through the transformer circuit, charging the condenser, which subsequently discharges through the spark gap." He then follows this electrical discharge through the spark gap with this explanation:

"If the capacity, the inductance, and the resistance of the circuit are of suitable values, the discharge is oscillatory, with the result that alternating currents of high frequency pass through the primary of the transformer and induce similar oscillations in the secondary." "These oscillations," he continues, "being rapidly radiated in the form of electric waves by elevated conductor."

He then described the features of the receiving station, which for the present purpose have been sufficiently stated. This is all doubtless very clear to those who are skilled in the art of wireless telegraphy, but to one who is unskilled in that art the operation of the signal key as described in the specification appears to be a trifle obscure. Mr. Marconi has previously referred to the transformer—

"connected in circuit with a condenser, a producer of Hertzian oscillations or electric waves, shown in the form of a spark producer and an induction coil (constituting a persistent oscillator), controlled *by a signaling instrument.*"

As testified by the witness Waterman:

"We do not produce electric waves in wireless telegraphy, because we care anything about the waves at all, but merely that they will carry to some distant station some little fragment of energy which we may utilize to gather an interpretable message."

The invention relates to apparatus for communicating electric signals without wires. That is the dominant purpose of the invention, that is its ultimate object, and we naturally expect the inventor to explain the manner of using this apparatus for that purpose, so that a person of ordinary intelligence may understand its operation. We are told that, when the signal key is pressed and the primary circuit of the induction coil is closed, the current then rushes through the transformer circuit, charging the condenser, which subsequently discharges through the spark gap; but for what purpose is this current rushed through the transformer, the condenser charged and then discharged through the spark gap? We naturally expect a statement of the manner of sending a signal or message by, through, or on the oscillating current, similar it may be to the sending of a message by wire, and we expect some explanation of how the interruptions of the current by the signal key opening and closing the circuit acts upon the high frequency oscillating current, discharging across the spark gap and through and out of the open circuit. We do not find this explanation in either the specification or claims of this patent, but we think we have found it sufficiently stated in the prior art and in Marconi's reissued patent, No. 11,913. In the specification in the application for the reissue of that patent he says:

"The operation of my apparatus and system of communication or signals is as follows: The Ruhmkorff coil or other source of high tension electrically capable of producing Hertz oscillations being in circuit with a signaling instrument—such as a Morse key, for instance—the operator, by closing the circuit in the way commonly employed for producing dots and dashes in ordinary telegraphy, will cause the oscillator to produce either a short or a more prolonged electric discharge or spark, or succession of sparks, and this will cause a corresponding short or more prolonged oscillation in the surrounding medium corresponding in duration to the short or longer electrical impulse which in ordinary telegraphy produces a dot or dash. Such oscillations of defined character will thereupon be propogated as such through the medium, and will affect the properly constructed instrument at a distant receiving station. * * * I am therefore enabled to communicate signals telegraphically without wires, by thus artificially forming oscillations at the transmitting station into definite signals by means of a signaling instrument and receiving and reading the same at a receiving station."

This description relates to the operation of sending signals by an apparatus devised for a single open transmitting circuit, while we are dealing with an apparatus devised for an association of two circuits at the transmitting station, one closed and the other open, and which we are told discharges its electricity in prolonged oscillations.

In the oral argument, counsel for plaintiff explained that a disturbance in the ether took the form of waves, which were radiated from their source as detached waves and obeyed some of the laws of light waves; that these waves were known as Hertz waves, because that eminent scientist was the first to prove that oscillatory electric currents produce ether waves. Counsel further explained that the production of an electric spark in the air produces an electric wave which is detached from the source of origin, and the energy is radiated in wave form throughout space, illustrating the idea by the act of throwing a stone into a pond of water, disturbing the equilibrium of the water, and thus producing a wave.

Now, we understand the movement of electricity in an apparatus such as we have before us; sparks are usually produced at a spark gap, but that the production of a "spark" is not the only or the most important function of a spark gap, but that it also co-operates with the condenser in the accumulation of a charge of electricity in the primary circuit, to be discharged across the spark gap and through the transformer into the open circuit; that while the spark producer at the spark gap disturbs the ether, it is not the disturbance that carries the signals. That disturbance is produced later in the open circuit, but for the present we must look upon the spark gap as co-operating with the induction coil and condenser in the accumulation of energy. The witness Waterman, referring to this movement, says:

"The spark gap being a means of first permitting the storage of energy and then acting as a releasing device, a trigger, so to speak, setting the energy into oscillation, and the oscillation of the energy produces the waves which are set off into space."

We shall therefore assume that the signal keys in these two devices operate in substantially the same manner, and that in each discharge across the spark gap there is a wave train, made up of a number or group of short individual waves, which together form a moving wave train, corresponding in length to the dashes and dots of the Morse alphabet, and that these trains form the signals sent out upon the ether waves from the open aerial circuit.

The complete Marconi system comprises four circuits, two at the transmitting station, and two at the receiving station. The specification describes their adjustment as follows:

"The capacity and self-induction of the four circuits—i. e., the primary and secondary circuits at the transmitting station and the primary and secondary circuits at any one of the receiving stations in a communicating system—are each and all to be so independently adjusted as to make the product of the self-induction multiplied by the capacity the same in each case or multiples of each other; that is to say, *the electrical time periods of the four circuits are to be the same or octaves of each other.*"

For the purpose of localizing the signals sent out from the transmitting station at one or more of the several receiving stations, the specification describes the apparatus at the receiving station as follows:

"In employing this invention to localize the transmission of intelligence at one of several receiving stations, the time period of the circuits at each of the receiving stations is so arranged as to be different from those of the other stations. If the time periods of the circuits of the transmitting station are varied until they are in resonance with those of one of the receiving stations, that one alone of all the receiving stations will respond, provided the distance between the transmitting and receiving stations is not too small."

Mr. Marconi then says:

"The adjustment of the self-inductance and capacity at any or all of the four circuits can be made in any convenient manner and employing various arrangements of apparatus, those shown and described herein being preferred. In practice," he says, "I have found the following preferred details of arrangement of apparatus to work well."

He then describes the wire for the aerial conductors at all stations and the conductor for the transformer windings at the receiving stations. The wire for and the forms of the induction coils are given. The tables for preferred adjustment are also given, with the details opposite any tune designated by number in the transmitting station table to be used in connection with those opposite the same tune designated by number in the receiving station table.

We come, now, to the claims of the patent, the essential elements of which must be ascertained for the purpose of determining the character of the improvement in apparatus claimed by Mr. Marconi as his invention, and which it is charged has been infringed by the defendant. The patent contains 20 claims. It is charged in the bill of complaint that 15 of these claims have been infringed by the defendant, viz. 1, 2, 3, 6, 8, 10, 11, 12, 13, 14, 16, 17, 18, 19, and 20. Five claims are not charged to have been infringed, viz. 4, 5, 7, 9, and and 15.

Of the claims charged to have been infringed, six relate to the transmitting apparatus, viz. 1, 3, 6, 8, 11, and 12. Six relate to the receiving apparatus, viz. 2, 13, 14, 16, 17, and 18. (Note—Claims Nos. 16 and 18 were not mentioned in plaintiff's argument.) Three relate to the combination of both the transmitting and receiving apparatus, viz. 10, 19, and 20. Of the claims not charged to have been infringed, three relate to the system of telegraphy, viz. 4, 5, and 7; one to the transmitting apparatus, viz. 9; one to the receiving apparatus, viz. 11.

The decree of the court below sustained the validity of all the claims charged to have been infringed, but found that the defendant's apparatus, known as "the Simpson transmitter," the "Thompson transmitter," and its "standard receiver," had not infringed any of the claims. In the oral argument, Mr. Bull, of counsel for the plaintiff and appellant, submitted this pertinent question as the objective point of his argument:

"What new and useful thing did Mr. Marconi contribute to the art in transmitters?"

He proceeded to answer the question by reference to Plaintiff's Exhibit No. 1 before the court. As we do not reproduce this exhibit, we will translate as nearly as possible the substance of Mr. Bull's answer:

"The closed circuit," he says, "contains a condenser and a spark gap. Those are the first two elements. The third element is the transformer, by which these two circuits are coupled or linked together. The fourth element," which Mr. Bull states is "the most important element, the soul of this invention," is that the open or antenna circuit and the primary or closed circuit "are both resonant or oscillatory circuits and are tuned to substantially the same frequency. This," he repeats, "is the soul of this invention." "You will find," he says, "these closed and open circuits in the prior art, but nowhere in the prior art will you find the antenna circuit and the closed circuit *both resonant or oscillatory circuits and both tuned to substantially the same frequency.* As Mr. Farnsworth (counsel for the defendant) said, resonant or oscillatory circuits must be tuned to substantially the same frequency or they will not transfer energy in an efficient way. Nowhere, indeed, in the prior art is there found a resonant or oscillatory antenna associated with a resonant or oscillatory circuit, joined together by a transformer or any coupling means."

The four essential elements of the present Marconi patent, as explained by Mr. Bull, are therefore the combination of

(1) The condenser;
(2) The spark gap;
(3) The transformer; and these so adjusted that
(4) The closed and open circuits are tuned to substantially the same frequency, or, in other words, are oscillatory circuits in resonance.

We find the combination of elements referred to by Mr. Bull, including "the soul of this invention," contained as elements in claim No. 6 for a transmitting apparatus. For convenience of reference and identification, we separate all the elements of this claim into the following clauses:

(1) At a transmitting station employed in a wireless telegraph system,
(2) The combination of a transformer, whose
(3) Secondary is connected to
(4) An open circuit, including
(5) A radiating conductor at one end and
(6) Capacity at the other end, and whose
(7) Primary is connected to
(8) A condenser circuit,
(9) Discharging through a means which automatically causes oscillations of the desired frequency, and
(10) Means for adjusting the oscillation period of each of the
(11) Two circuits connected with
(12) The transformer
(13) To bring them into accord with each other.

We have here in clause 8 of this claim the "condenser circuit," which, of course, includes the "condenser" referred to by Mr. Bull as the first element in his classification. The "spark gap" is not des-

ignated by name, but we have in clause 9 the equivalent in the element "discharging through a means which automatically causes oscillations of the desired frequency." This is the second element in Mr. Bull's classification. In clause 12 we have the "transformer," the third element in that classification, and in clauses 10, 11, 12, and 13 we have the elements which tune the closed and open circuits to substantially the same frequency, viz.:

"Means for adjusting the oscillation period of each of the two circuits connected with the transformer to bring them into accord with each other."

This is the fourth element and the "soul of the invention" as claimed by Mr. Bull. The "condenser," "spark gap," and "transformer" were old in the art, and could only be invention in some new and useful combination, which in this patent is a combination producing resonance between the closed and open circuits.

In claim No. 14, for a receiving apparatus, we find the essential elements of the plaintiff's apparatus described. We also separate the elements of this claim into the following clauses:

(1) The combination of an oscillation transformer;
(2) An open circuit connected with
(3) One coil of said transformer, said circuit including
(4) An oscillation receiving conductor at one end and
(5) Capacity at the other end;
(6) A wave responsive device electrically connected with
(7) The other winding of the oscillation transformer,
(8) And means for adjusting
(9) The two transformer circuits in
(10) Electrical resonance with each other.

We have here in clause 1 the combination of an oscillation transformer; in clause 4 an oscillation receiving conductor; in clause 5 capacity; in clause 6 a wave responsive device; in clause 8 means for adjusting; in clause 9 the two transformer circuits; in clause 10 in electrical resonance with each other.

In claim No. 10, for both a transmitting and receiving apparatus, the element of resonance is made the sole essential element of the invention. The clauses of this claim are as follows:

(1) The transmitting station and
(2) The receiving station each contains
(3) An oscillation transformer,
(4) One circuit of which is
(5) An open circuit and the other
(6) A closed circuit; the
(7) Two circuits at each station being
(8) In electrical resonance with each other and
(9) In electrical resonance with the circuits at the other station.

The elements in clauses 1 to 8 relate to the essential elements of resonance between the circuits at the transmitting and receiving station. The element in clause 9, relating to resonance between stations, is nowhere claimed by Mr. Marconi as his separate invention, except in the combination of the element of resonance between the primary

and secondary circuits at the transmitting and receiving stations. We may say here, as well as elsewhere, that resonance between stations was part of the prior art described and claimed by Lodge in patent No. 609,154, dated August 16, 1898.

Claim No. 20 is also for both a transmitting and receiving apparatus, and sets forth the essential elements in further detail, which are also reproduced in separate clauses:

(1) *A transmitting station,*
(2) Containing an oscillation transformer,
(3) The primary of which is connected to a
(4) Condenser circuit,
(5) Discharging through a spark gap,
(6) Which automatically causes electrical waves of the desired frequency;
(7) The secondary of said transformer connected to an
(8) Open circuit, including a
(9) Radiating conductor, and with a
(10) Capacity and a
(11) Coil for charging the
(12) Condenser aforesaid.
(13) *Receiving station,*
(14) Containing an oscillation transformer,
(15) The primary of which is connected to an
(16) Oscillation receiving conductor and with a
(17) Capacity,
(18) A wave responsive device connected with the
(19) Secondary of said transformer,
(20) And a receiving instrument
(21) Connected with the wave responsive device,
(22) All in combination with means for bringing
(23) The four transformer circuits,
(24) Two at each station,
(25) Into electrical resonance with each other.

We have here in clause 4, for a transmitting apparatus, a "condenser circuit"; in clause 5 "discharging through a spark gap"; in clause 2 "an oscillation transformer"; and in clause 6 "a spark gap" automatically causing electrical waves of the desired frequency, which means, of course, the desired frequency to produce resonance between the closed and open circuits. For the apparatus at the receiving station we have in clause 14 "an oscillation transformer"; in clause 17 "capacity;" in clause 20 "a receiving instrument"; in clause 21 connected with a "wave responsive device"; in clause 22 "all in combination with means for bringing"; in clause 23 "the four transformer circuits"; in clause 24 "two at each station"; in clause 25 "into electrical resonance with each other."

The electrical resonance mentioned in clause 25 includes the resonance between the stations described by Lodge in his patent No. 609,-154, dated August 16, 1898, but here it is in combination with the resonance between the primary and secondary circuits of both the transmitting and receiving stations. We have, then, in these four

claims, 6, 14, 10, and 20, all the essential elements of the present Marconi patent involved in this controversy.

[1] The appellant contends that these claims describe a broad, primary invention, valid in scope and of great commercial importance, to which should be given a broad and liberal interpretation within a wide range of equivalents. The rule in such a case was stated by the Supreme Court in Westinghouse v. Boyden Power Brake Co., 170 U. S. 537–561, 18 Sup. Ct. 707, 718 (42 L. Ed. 1136), as follows:

"To what liberality of construction these claims are entitled depends to a certain extent upon the character of the invention, and whether it is what is termed in ordinary parlance a 'pioneer.' This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are: The one to Howe, of the sewing machine; to Morse, of the electrical telegraph; and to Bell, of the telephone. The record in this case would indicate that the same honorable appellation might be safely bestowed upon the original air brake of Westinghouse, and perhaps also upon his automatic brake. In view of the fact that the invention in this case was never put into successful operation, and was to a limited extent anticipated by the Boyden patent of 1883, it is perhaps an unwarrantable extension of the term to speak of it as a 'pioneer,' although the principle involved subsequently and through improvements upon this invention became one of great value to the public. The fact that this invention was first in the line of those which resulted in placing it within the power of an engineer, running a long train, to stop in about half the time and half the distance within which any similar train had stopped, is certainly deserving of recognition, and entitles the patent to a liberality of constructon which would not be accorded to an ordinary improvement upon prior devices. At the same time, as hereinafter observed, this liberality must be exercised in subordination to the general principle above stated: That the function of a machine cannot be patented, and hence that the fact that the defendants' machine performs the same function is not conclusive that it is an infringement."

The reference in this opinion of the Supreme Court to the Westinghouse invention and the fact that it was the first in the line of those which resulted in placing it within the power of an engineer running a long train to stop in about half the time and half the distance within which any similar train had stopped is paraphrased with respect to a somewhat different, but equally meritorious, function claimed for the patent in suit in the testimony of Mr. Marconi in this case. He says that prior to the adoption and utilization of the invention described in the patent in suit the distance to which he could transmit and receive messages was 82 miles; that, due to the utilization and adoption of the invention in this patent, he was able to actually transmit and receive intelligible messages to the distance of 6,600 miles. If this improvement in the function of the apparatus is due wholly to the improvement of its mechanism, and not to mere increase in energy, it is, as stated by the Supreme Court in the Westinghouse Case, "deserving of recognition and entitled the patent to a liberality of construction which would not be accorded to an ordinary improvement upon prior devices"; but it appears that the Westinghouse improvement on his previous "pioneer" device was not sufficient to bring the Boyden

mechanism within the range of an infringing device, the court holding that the liberality of construction asked for on behalf of the Westinghouse improvement must be exercised in subordination to a certain general principle therein stated. In this case the defendant contends that a liberality of construction does not obtain in favor of the improvement claimed by Mr. Marconi in the patent in suit, in view of the prior art and patents issued to him for improvements in apparatus for wireless telegraphy and the proceedings in the Patent Office in obtaining the present patent.

It appears that between the Marconi patent, No. 586,183, dated July 13, 1897, for improvement in transmitting electrical impulses and signals and an apparatus therefor, and the present patent, No. 763,772, dated June 28, 1904, for improvements in apparatus for wireless telegraphy, there were issued to him six American patents, as follows:

No. 627,650, dated June 27, 1899, for new and useful improvements in apparatus employed in wireless telegraphy;

No. 647,007, dated April 10, 1900, for certain new and useful apparatus employed in wireless telegraphy:

No. 647,008, dated April 10, 1900, for certain new and useful apparatus employed in wireless telegraphy;

No. 647,009, dated April 10, 1900, for certain new and useful apparatus employed in wireless telegraphy;

No. 668,315, dated February 19, 1901, for certain new and useful receiver for electrical oscillations;

No. 676,332, dated June 11, 1901, for certain new and useful improvements in apparatus for wireless telegraphy.

We do not understand that defendant claims that the improvements described in these six patents anticipate the combination of improvements claimed in the patent in suit, but the claim is made that the real pioneer patent, the one upon which Mr. Marconi's reputation as an inventor is justly placed, is the patent numbered 586,183, dated July 13, 1897—reissue No. 11,913, dated June 4, 1901. In this patent claim was made for earth connection at both the transmitting and receiving stations. This was an important improvement and is the foundation for the present system of practical wireless telegraphy. It was through this discovery that Mr. Marconi was given the Nobel prize in physics with Ferdinand Braun in 1909. In his Nobel prize lecture, delivered at the Royal Academy of Science, Stockholm, December 11, 1909, Mr. Marconi describes his discovery as follows:

"In August, 1895, I discovered a new arrangement which not only greatly increased the distance over which I could communicate, but also seemed to make the transmission independent from the effects of intervening obstacles. This arrangement consisted in connecting one terminal of the Hertzian oscillator, or spark producer, to earth, and the other terminal to a wire or capacity area placed at a height above the ground, and in also connecting at the receiving end one terminal of the coherer to earth and the other to an elevated conductor. I then began to examine the relation between the distance at which the transmitter could affect the receiver, and the elevation of the capacity areas above the earth, and I very soon definitely ascertained that the higher the wires or capacity areas the greater the distance over which it was possible to telegraph."

265 F.—42

In this same lecture Mr. Marconi further said:

"A remarkable fact, not generally known, in regard to transmitters, is that none of the arrangements employing condensers exceed in efficiency the plain elevated aerial or vertical wire discharging to earth through a spark gap as used in my first experiments. * * * I have also found that by this method it is possible to send signals 2,000 miles across the Atlantic with a smaller expenditure of energy than by any other method known to myself."

Bear in mind this lecture was delivered on December 11, 1909, and no claim was there made that any important contribution had been made by him to the system of wireless telegraphy since 1897, or by the patent now before us, dated June 28, 1904. How, then, can we give to this last patent the character of a "pioneer," with that liberality of construction that will give it broadly all the rights of such a patent against equivalents? This original patent of 1897 and its reissue of June 4, 1901, expired July 13, 1914. The present suit was commenced August 14, 1915. The discovery of the improvement described in the original patent, although pioneer in character and of great importance, is therefore not involved in this case.

This brings us to the consideration of the character and scope of the claims of the patent in suit with respect to the "soul of the invention," viz. the resonant or oscillatory circuits tuned to substantially the same frequency. The elements involved in this question were necessarily presented to the Patent Office of the United States when Mr. Marconi applied for this patent, and we go to the "file wrapper" for information on this subject. The original application was filed November 10, 1900. It contained 7 claims. All were wholly rejected by the Patent Office on December 24, 1900, on elements of the prior art as disclosed in British patent to Lodge, No. 29,505, of 1897, the Marconi patent, No. 586,198, of July 13, 1897, and the Pupin patent, No. 640,516, of January 2, 1900.

On July 1, 1901, the attorneys for Mr. Marconi requested the cancellation of specification and all claims on file down to, but not including, the signatures, and the substitution of new specification and new claims. Then follows proceedings relating to numerous objections made by the examiner to specifications and claims, and amendments thereof by Mr. Marconi's attorneys in response to such objections, during a period from August 12, 1901, to June 3, 1902. Then follows a period of 16 months, when all proceedings in the Patent Office were suspended, because of which it was held by the Patent Office that, as there had been a failure to prosecute the application for more than a year, the application had been abandoned on June 3, 1903, under section 4894 of the Revised Statutes (Comp. St. § 9438). On October 6, 1903, the attorneys for Mr. Marconi petitioned for a revival of the application, and replied to the action of the Patent Office of June 3, 1902, differentiating the claims objected to by the examiner from the Tesla patent. In answer to this petition, and showing in support thereof, the examiner on October 15, 1903, made a statement with respect to the facts alleged in the petition as constituting a showing of unavoidable delay. The examiner refers to the practice in the Patent Office to overlook such a delay where the amend-

ment submitted with the petition has been such as to put the application in condition for allowance without further action on the part of the office. He then says:

"In order to ascertain if such treatment could be accorded in the present case, a careful examination has been made of the amendment submitted with this petition. As a result of such examination, the following report is made: 'Many of the claims are not patentable over Tesla, 645,576 and 649,621, of record; the amendment designed to overcome said references, as well as Marconi's pretended ignorance of the nature of a 'Tesla oscillator,' being little short of absurd. Ever since Tesla's famous lecture on alternating currents of high frequency, delivered before the American Institute of Electrical Engineers in 1891, and repeated in 1892 before the Institute of Electrical Engineers and the Royal Institution, London, the Société Internationale des Electriciens and the Société Française de Physique, Paris, which lectures have been widely published in all languages, the term 'Tesla oscillator' has become a household word on both continents.' "

The examiner comments further upon the "'Tesla oscillator," and refers to an argument presented by an associate attorney for Mr. Marconi to the effect that a failure to revive the case would work irreparable injury to the assignees, because Marconi's British patent, 7,777 of 1900, filed April 26, 1900, operates as a bar to a new application for what he calls "this valuable invention." To this the examiner replies:

"It is true that said British patent, as well as other foreign patents, so operates, and it is true that this is a valuable invention; but, in the opinion of the examiner, the references above cited, and also numerous other references, some of which are hereinafter set forth, effectually dispose of the idea that this is a valuable application, however valuable may be the invention disclosed therein, because any patentable claims which this application will support, in view of the state of the art, must necessarily be of the most limited character."

The examiner also objects to certain amendments upon reference to Pupil, Fessenden, and Stone.

Upon this statement some further showing was made by the attorneys for Mr. Marconi in support of the petition for a revival of the application on the ground of unavoidable delay, and on October 24, 1903, filed additional amendments to meet certain objections of the examiner which were accepted as removing such objections. The application was thereupon revived by the Commissioner of Patents, and the patent allowed with certain amendments conforming to the exceptions submitted by the examiner.

In submitting these final amendments on May 28, 1904, the attorneys for Mr. Marconi said:

"The claims now presented all include an elevated conductor, or a circuit which is a good radiator of electric waves or oscillations, and means for adjusting the tune of such elevated conductor or radiating circuit. It is believed that the examiner recognizes the fact that the Stone patent does not show such an arrangement, and an early allowance is requested."

The patent was issued and accepted by the patentee and his assignee as it was thus finally limited. It will not be necessary to review the proceedings in the Patent Office in further detail. It will be sufficient to say that Mr. Marconi, in his amended specification dated July 1,

1901, clearly stated the character of his invention as claimed in the patent in suit, when he compared it to his original patent No. 586,183, dated July 13, 1897, reissued June 4, 1901, No. 11,913, where he says:

That he had "shown and described" in the original patent "the combination at a transmitting station of an oscillation producer, such as an induction coil, having one end of its secondary coil connected to one contact of a spark producer and to the earth, and having the other end of the said secondary connected to the opposite contact of the spark producer and to a vertical wire or elevated plate, and I have further shown at a receiving station an imperfect contact connected in circuit with a vertical receiving wire and with the earth. According to the present invention," the patent in suit, "the system includes at the transmitting station the combination, with an oscillation transformer of a kind suitable for the transformation of very rapidly alternating currents, of a persistent oscillator, and a good radiator; one coil of said transformer being connected between the aerial wire or plate and the connection thereof to earth, while the other coil of the transformer is connected in circuit with a condenser, a producer of Hertzian oscillations or electric waves shown in the form of a spark producer, and an induction coil (constituting the persistent oscillator) controlled by a signaling instrument. The complete system also includes at a receiving station an oscillation transformer, one coil whereof is included between the aerial receiving wire and earth, constituting a good absorber of electrical oscillations, while a device responsive to electric waves, such as an imperfect contact or a device for operating the same, is included in a circuit with the other coil of said transformer. The system also requires as essential elements thereof the inclusion in the lines (at both stations) from the aerial conductor to the earth of variable inductances and the use at both stations of means for varying or adjusting the inductance of the two circuits at each station to accord with each other. By this arrangement of apparatus, I am able to secure a perfect 'tuning' of the apparatus at a transmitting station and at one or more of a number of receiving stations."

Translated into untechnical language, Mr. Marconi stated to the Patent Office officials:

"In the progress of my application of a patent through your office, your examiners have made various objections to my specification and claims, based upon the prior art. I have met these objections as they have been raised by appropriate cancellations and amendments, until now the application is reduced to the claim of invention for the tuning apparatus between the closed and open circuits at a transmitting station and between a transmitting station and with one or more of a number of receiving stations. For that invention I now ask that I be granted a patent."

To the application reduced to this form, the Patent Office officials replied: "With such limitations we grant you the patent"—and the patent was so granted and accepted.

As has been stated, the complaint in this case charged, not only an infringement by the defendant of the Marconi patent, No. 763,772, dated June 28, 1904, but also an infringement by the defendant of the Lodge patent, No. 609,154, dated August 16, 1898, for "improvements in wireless telegraphy." The District Court held that the defendant had infringed this last-named patent by manufacturing and selling apparatus employing the invention, but no injunction was granted restraining the infringement, as the patent had expired August 16, 1915, and no accounting of profits and damages was ordered, as a settlement had been made between the parties. The defendant admitted the infringement of the Lodge patent, but denied its validity. No

appeal has been taken by either party from this decree, and the decree has accordingly become final in that respect.

[2] The defendant's contention is in effect that its infringement of the Lodge patent was the only ground of complaint the plaintiff ever had in this case, and that with respect to the Marconi patent in suit it cannot now be expanded to include the Lodge invention. This contention is undoubtedly correct. In reaching this conclusion we have not only carefully examined the proceedings in the Patent Office and the reference to the prior art contained in the reports of the examiners in the patent office, but we have also read the able reviews of the prior art in the opinions of Judge Townsend in Marconi v. De Forest (C. C.) 138 Fed. 657, of Judge Veeder in Marconi Wireless Telegraph Co. v. National Electric Signal Co. (D. C.) 213 Fed. 815, and of Judge Neterer in this case, 239 Fed. 328. In the prior art, as thus disclosed, we find that the claims of the patent may be sustained for the combination of elements such as are found typical in claims Nos. 6, 14, 10, and 20 for both transmitting and receiving apparatus; that is to say, the two circuits at each station being tuned and in electrical resonance with each other, and in this combination a tuning of the two circuits at the transmitting station with the two circuits at the receiving station to an electrical resonance with each other. This last element was in the prior art, but the plaintiff became the owner of it by the purchase of the Lodge patent in 1912, and as we read the record the defendant is not now in a position to object to it as a part of the plaintiff's apparatus in combination with the other tuning elements; but we find no justification for any broad construction of these claims with respect to any of the elements therein described, and no right to a broad range of equivalents.

## The Charge of Infringement.

[3] We come now to the charge of infringement, brought against the defendant for the manufacture and sale of the "Simpson" and "Thompson" transmitters and the "standard receiver." These devices were shown and explained to the court below by expert witnesses, using the mechanism of the various devices, in demonstrations, showing and explaining their essential parts and the actual operation of each part. We have the mechanism of the devices presented to us in exhibits and displayed by figures, diagrams, and charts, with the printed testimony of the witnesses, identifying the parts by numbers and letters; but we have not seen the mechanism in operation in any demonstration, nor have we seen the witnesses or had the advantage by timely inquiries to come into personal touch with the real life blood of the case or the mental attitude of the witnesses with respect to technical and obscure distinctions. We have, however, after much labor with the "dry bones" of the case, made ourselves familiar with all its essential details as presented in the record, and we may now proceed to determine the fundamental questions in the case; i. e., whether the findings of the trial court are supported by the evidence, and whether such findings support the decree.

## The Simpson Transmitter.

We have read carefully the evidence on behalf of the plaintiff tending to show that the Marconi and Simpson transmitters are substantially the same. That there are two circuits in each transmitter is conceded by the defendant. The first question then arises: How are these circuits associated together in these two devices? Are they the same, within the meaning of the patent law? The plaintiff contends that they are associated together by the same or equivalent means; but, as we have before stated, the broad rule of equivalents does not obtain in favor of the combination of elements described in this patent. The inquiry is then limited to the question whether the two circuits in the Simpson transmitter are associated together by substantially the same means as the two circuits in the Marconi transmitter. In the Simpson transmitter the association is an actual connection through the condenser. In the Marconi transmitter the association is through the transformer. The plaintiff defines "condenser" as a device for localizing capacity in an electric circuit. There are two classes of condensers, "fixed" and "variable." The plaintiff also defines "transformer" as a device for transferring energy from one circuit to another, and that, broadly speaking, there are two classes of "transformers"; the first class is a "step-up" transformer, and the second is a "step-down" transformer. Here is a difference in mechanism that at once arrests attention. Does this difference enter into the combination of elements to produce substantially a different result?

The trial court in its opinion described the arrangement and mode of operation of the Simpson transmitter, referred to the elements designated on the diagram as a condenser, spark gap, flat spiral inductance coil, and a conductor, connecting the spark gap with the ground connection, and found as a fact that they comprise part of the antenna circuit, having the characteristic of a large ratio of capacity to inductance, and it was therefore not a persistently oscillating generating circuit, but had the function of disturbing the equilibrium of forces which existed in the antenna circuit in order that it might produce persistent oscillations of a single frequency in the antenna system, and the court found the effect of this to be that the "energy is placed within the antenna circuit, the antenna proper of the transmitter, directly from its source."

"The circuit," says the court (referring to what the plaintiff designates in the Simpson transmitter as the "primary circuit"), "has enormous decrement and is not persistent. It is not, as in the Marconi patent in suit, primarily a reservoir or persistent oscillator, and does not co-operate with the antenna on the principle of resonance."

These findings point to features of the Simpson transmitter, including the condenser and spark gap, which distinguish it from the Marconi transmitter. Does the evidence justify such findings?

Frederick A. Kolster, called as a witness for the defendant, testified that he had been four years connected with the Bureau of Standards

in Washington as Chief of the Radio Section of the Electrical Division of the Bureau. He referred to the "Simpson transmitter" as the "Simpson mercury valve type"; that in such a transmitter the mercury valve was a rectifier, and rectified the alternating current into what might be called the pulsating current; that the purpose of the mercury valve was to prevent the forming of an arc at the spark gap, that the spark gap might rapidly gain its high resisting quality and open up, in order that it might leave the antenna free to oscillate in its own natural way thereafter; that—

"another characteristic of this circuit is that it is not a persistently oscillating generating circuit. It is what I might call," he says, "a disturbing circuit. It has a means for disturbing the equilibrium of forces which exist in the antenna system, in order that it may produce persistent oscillations of the single frequency in that antenna system"; that "the effect of such a circuit upon the radiating circuit was such as to get the energy in that radiating circuit very quickly, and to thereafter allow it to oscillate freely according to its own natural way; that the frequency of these oscillations was always determined by the values of the elements of the radiating circuit, and that the persistency or the time which these oscillations lasted was always determined entirely by the constants of the antenna system, and in every way the oscillations which were emitted by the antenna system were entirely determined by its natural characteristics."

Frank G. Simpson, the electrical engineer who designed the Simpson mercury valve transmitter explained in detail how this transmitter functioned. He also testified that the flow of the current to the radiating system was always in one direction, the effect of which was that the—

"energy was placed within the antenna circuit, the antenna proper of this transmitter, directly from its source. * * * The energy is communicated directly from its source to the antenna; the antenna being arranged in this manner to provide means whereby the energy can be held there."

Dr. Jonathan Zenneck, of Munich, Germany, a leading authority on wireless telegraphy, was a witness for the defendant. His testimony is important, but highly technical, and cannot be transferred to this opinion, even in a condensed form; but its substance can be stated in a few words. It is to the effect that the Simpson transmitter is not a persistent oscillator; that after an extremely small percentage of the entire oscillation time has passed the antenna oscillates freely in its own time and without interference from any connected circuit, and that the oscillations are not the result of a resonant transmitter of energy. These and other minor distinctions, as compared with the Marconi apparatus, described in the patent in suit, demonstrate beyond question that the Simpson transmitter is not a persistent oscillator, and does not transfer energy by resonance. It is therefore a different mechanism, operates in a different manner, and accomplishes a different result. We therefore conclude that the court below was right in holding that the Simpson transmitter is not an infringement of the plaintiff's patent.

## The Thompson Transmitter.

The plaintiff contends that the Thompson transmitter, in its construction, material elements, and mode of operation, is essentially

the same as the Marconi transmitter; that it operates on the same principle of resonant transfer of energy as the Marconi transmitter, having two oscillatory wireless circuits, the closed and nonradiating primary spark gap circuit, acting as a reservoir from which energy is rapidly and resonantly transferred in the form of oscillations to the open radiating antenna circuit, and these, two circuits are tuned together to such a degree that whatever efficiency the Thompson transmitter has is due to the resonance and tuning between the circuits.

The defendant contends, on the other hand, that in none of the elements mentioned is the Thompson transmitter the same, or substantially the same, as the Marconi transmitter, but, on the contrary, that it is based squarely upon the impulse method of transferring energy, founded by Lodge and described in patent No. 609,154, issued to him August 16, 1898. In the specification for the Lodge patent, Lodge specified that he charged the radiator—

"by aerial disruption or impulsive rush. The advantage of this," he says, "is that charges so communicated are left to oscillate free from any disturbance due to maintained connection with the source of electricity, and therefore oscillate longer and more simply than when supplied by wires in the usual way."

The defendant admits that the Thompson transmitter comprises two circuits, but contends that the first or primary circuit is an impulse circuit, which is so constructed as to disgorge practically its entire energy in one big, untunable impulse.

The court below in its opinion found as a fact that—

"The operation of the Lodge patent (Fig. 4) is identical with the defendant's, in using impulse charging and variable inductance coil in the antenna."

The court also found that the Lodge patent—

"does not use one circuit as a reservoir for the other, there being no resonant transfer of energy, the circuit in which the charge originates being entirely separated when the radiating circuit is charged;" that "no reservoir circuit is used, and when the radiating circuit is charged it is entirely separated from the source of supply circuit, which necessarily has some natural period."

The court also found:

"For the purpose of furnishing a pure wave, Lodge provides that the energy undelivered to the radiating circuit be cut off, and states 'that the advantage of this is that charges so communicated are left to oscillate free from any disturbance due to maintained connection with the source of electricity,' and the maximum effect will be produced on the receiving circuit."

The court, in referring to the "Lodge patent, Figure 4," was referring to the American patent, No. 609,154, issued to Lodge August 16, 1898. This was one of the patents charged to have been infringed in this case. The claims charged to have been infringed were 1, 2, and 5. The court sustained the validity of these claims and decreed their infringement by the defendant during a period while the plaintiff was the owner of the patent, just prior to its expiration. The defendant has settled with the plaintiff with respect to that infringement. The decree has become final and the subject-matter res judicata between the plaintiff and defendant.

The Lodge patent expired August 16, 1915. For a period of at least 3 years prior to the expiration of that patent the plaintiff was the sole owner of the Lodge patent, and it was because of that ownership by the plaintiff and the defendant's infringement of claims 1, 2, and 5 thereof by the manufacture and sale of the Thompson transmitter that the decree was entered in favor of the plaintiff. It is obvious that, if the defendant's Thompson transmitter is the same as the Lodge transmitter in mode of operation and in essential elements, it cannot be at the same time an infringement of the Marconi patent, issued nearly 6 years later, unless there are other essential elements in the Thompson transmitter, not in the Lodge patent, but found in the Marconi patent.

G. W. Pickard, a research engineer and designer with the Wireless Specialty Apparatus for more than 10 years, was a witness for the defendant. He was asked:

"State fully everything you find disclosed in the Marconi patent in suit which you find also in defendant's standard impulse transmitter, and which you do not find disclosed in the expired Lodge patent, No. 609,154."

"Answer: Nothing."

Dr. Kolster, of the Bureau of Standards, testified that:

"The general tests which I have made on the Admiral Evans and also which I have made at the Bureau of Standards indicate to me that the useful energy, which is rapidly transferred to the antenna system, goes over almost entirely in the first snap of that circuit."

The witness was referring to tests made with the Thompson transmitter. The witness was asked whether or not this transfer of energy to the antenna circuit depended on the tuning of these two circuits together. His answer was:

"This transfer of energy from the charging circuit to the antenna circuit does not depend at all upon the question of tuning the two circuits together, because no adjustments are made in the charging circuit; the elements of that circuit being entirely fixed and nonadjustable."

The witness was asked what practical advantages there are, if any, with regard to the ordinary handling of commercial messages, or in the handling of messages relating to vessels in distress, in the use of a transmitter which operates independently of the phenomena of resonance between the circuits over the use of a transmitter depending upon the phenomena of resonance for its efficient operation. The witness' answer was:

"There is a great advantage in connection with apparatus which is to be used on commercial or passenger steamers in having the arrangements such that the fewest possible adjustments are necessary, and in connection with this type of apparatus the proper operation is assured by a very simple change in the adjustment of the inductance coils in the antenna circuit. It has been my experience, in connection with that particular matter, that in all cases where the apparatus on shipboard was of a rather complicated type, such as the coupled tuned circuit, that it was seldom in proper operation. Such types of apparatus always lead to considerable trouble, due to the interference cause by that station, by virtue of the fact that, unless those adjustments were very carefully made, two wave lengths would be emitted from the station, with a resulting undesirable interference and confusion."

Mr. Thompson, testifying with respect to this feature of the "tuned" type of transmitter, said:

"My experience with associated circuits has taught me that, if the two circuits are persistent oscillators, they have to be adjusted to the same time period before they will work with each other. Otherwise, the swing in one of the circuits might be going forward, while the swing in the other circuit was going backward, and they would meet each other, and the effect of one would neutralize the other, and there would be nothing happen."

The use of the word "tuned" in the adjustment of the apparatus in the transmission of electric oscillations had been criticized as not quite accurate, as the word "tuned" relates to sound waves, and not to electric or ether waves. Sir Oliver Lodge has accordingly referred to the frequencies of such oscillations as being "tuned," or "timed," or "syntonized"; but we need not dwell upon refined word distinctions, when we know what the word means, which in the Marconi patent means the frequencies of electric oscillations between the primary and secondary circuits at the transmitting station and the primary and secondary circuits at one or more of a number of receiving stations in a communicating system. The difference between a "tuned" and an "untuned" circuit is an important question in this case; but as the flow of the alternating electrical current in such oscillations cannot be seen we can only judge by results.

Bangay, in his brief, but clear, exposition of the "Elementary Principles of Wireless Telegraphy," refers to the spark gap method of producing high frequency oscillating currents and says:

"If * * * the values of capacity and inductance of the aerial circuit are arranged so that the aerial has a frequency different from that of the closed circuit, the aerial will try to oscillate at its own frequency, in opposition to the oscillations put into it by the closed circuit, with the result that one set of oscillations will interfere with the other, and very little energy will be transferred from the closed to the open circuit. Under these conditions the two circuits are said to be 'out of tune.'"

To penetrate further into the behavior of the high frequency current in such an apparatus, we must enter the domain of scientific conjecture and judge of the operation by results. To quote again from Bangay:

When the circuits are out of tune "the first oscillation in the closed circuit induces a wave in the aerial coil; this wave travels to the aerial, reaches the free insulated end, turns back and tries to return to earth, but on its way there it meets another wave coming up the aerial induced by the second oscillation in the closed circuit which is not 'keeping time' properly with the aerial and these two waves partly destroy one another; but if the aerial circuit is so arranged as to have the same frequency as the closed circuit, the first wave, instead of meeting a contrary wave, will travel down to earth unhindered, and as it swings back again it will find the second wave induced from the closed circuit ready to continue in its progress to the aerial and down again to earth; and this will go on, one wave adding onto the others already in the aerial until the condenser is discharged; that is to say, until the energy originally stored in the closed oscillatory circuit is transferred to the aerial. Under this condition the two circuits are said to be "in tune.'"

In the Thompson transmitter there is no persistent oscillator in the primary circuit. The transfer of energy from the primary to

the secondary circuit is described as the "single chunk" transfer, which appears to operate upon the principle of the sling, a weapon which was used before the introduction of firearms.    In this weapon a stone is hung in a piece of leather suspended between two cords and is swung rapidly around.    When the energy of the arm in its circuitous motion has been accumulated and stored up in the stone, one cord is released, the spark gap is opened, so to speak, and the stone flies off in a tangent, its initial velocity having the same force it had at the last moment of revolution.

This was the weapon and transfer of energy used by David in his celebrated duel with Goliath, told in 1 Samuel xvii, 49.    David had other stones in his bag to throw with the same accumulation of energy, had the first failed, but there would have been no synchronism or resonance in these successive throws.    Each would have been independent of the other and independent in result.    We are of the opinion that the weight of evidence establishes the following facts:

That the primary circuit of the Thompson transmitter is not a resonant circuit in a persistent oscillating relation to the secondary circuit; that there is no transfer of energy from the primary to the secondary circuit by electric waves following each other in resonant succession; that the primary circuit does not accumulate or store up energy to be gradually drawn upon by the radiating circuit; that there is not in the primary circuit the persistent oscillator described in the Marconi patent, but we do find the "impulsive rush" described by Lodge in his specification, and its advantage to be:

"That charges so accumulated are left to oscillate free from any disturbance due to maintained connection with the source of electricity."

We are therefore of the opinion that the trial court was right in holding that the Thompson transmitter was not an infringement of the Marconi patent.

### The Standard Receiver.

With respect to the defendant's standard receiver the court below in its opinion refers to the demonstrations and other evidence tending to show that it is the same as the Lodge receiver, with its oscillating circuit and its inductance and capacity values so adjusted that its time period is that of the distant transmitter.    In other words, the antenna circuit of the Lodge receiver, like defendant's standard receiver, is tuned to the distant transmitter, but the antenna or secondary circuit of the receiver is so associated or linked with the primary or receiving circuit that it does not in any way interfere or hinder the oscillations of the receiving antenna; "the idea being," as stated by Lodge, "thus to leave the resonater free to vibrate electrically without disturbance from attached wires."    The court says:

"The idea being to have one single free oscillating circuit at both the transmitter and receiver."    The Court finds, further, "such receiver is commercially operative, the efficiency of which has been demonstrated before the court."

The court also found as a fact that in the defendant's receiver, corresponding to the Lodge receiver, there are no adjustments; where-

as, in the Marconi receiver there are a series of adjustments—adjustment in inductance, adjustment in capacity; these being the adjustments by which the one circuit is operated in resonance or tune with the other circuit.

The court found further that:

"In the demonstration before the court it was shown that it was necessary to make adjustments in the antenna or receiving circuit, and also to make adjustments of inductance and capacity in circuit No. 2 (primary), while but one adjustment was made in the defendant's receiver, that being in circuit No. 1 (antenna)."

The court said:

"It is apparent that this receiver [the defendant's] is a one-tuned circuit, that being a fixed or nontunable circuit, while the plaintiff's receiver is a two-tuned circuit, the one being tuned to the other by independent adjustment."

The court finds further:

"The defendant's receiver does not include the essential elements of the plaintiff's receiver. The persistent oscillator, variable condenser, and variable inductance of the detector circuit are all lacking. There is no relation to tuning."

With respect to the receiver, the defendant's witness G. W. Pickard was asked a question similar to the one asked him with respect to the transmitter:

"Will you state fully, please, everything you find described in the Marconi patent in suit at the receiver, which you also find in the defendant Standard Commercial Receiver, and which you do not find disclosed in the Lodge patent No. 609,154?" Answer: "Nothing."

It is not practical to review the voluminous testimony relating to the defendant's standard receiver. We have read it all, and have reached the conclusion that it supports the findings of the court below that the defendant's standard receiver was not an infringement of the plaintiff's patent, and that on the whole case the findings support the decree.

By agreement of counsel there was withdrawn from this appeal the charge of infringement relating to certain apparatus sold by the defendant to the Navy Department and the question as to that infringement be remanded to the District Court. The question of costs in this court and in the court below with respect to that feature of the case is left for future determination.

The decree of the court below in all other respects is affirmed.