### HEIDBRINK et al. v. McKESSON.

(Circuit Court of Appeals, Sixth Circuit. July 17, 1923.)

Nos. 3781, 3782.

1. **Patents ☞328—1,265,910, for device for administering anæsthetics, held invalid.**
   Heidbrink patent, No. 1,265,910, claims 1 and 2, relating to a device for administering anæsthetics, *held* invalid, because functional.

2. **Patents ☞328—1,309,686, for device for administering anæsthetics, claims 6 and 7, held not infringed.**
   Heidbrink patent No. 1,309,686, claims 6 and 7, relating to a device for administering anæsthetics, *held* not infringed.

3. **Patents ☞328—1,028,582, for device for administering anæsthetics, held not infringed.**
   McKesson patent, No. 1,028,582, claims 1, 7, 8, 9, 10 and 14 relating to a device for administering anæsthetics, *held* not infringed.

4. **Patents ☞328—1,028,583, for device for administering anæsthetics, held not infringed.**
   McKesson patent, No. 1,028,583, claims 2, 8, and 9, relating to a device for administering anæsthetics, *held* not infringed.

5. **Patents ☞328—1,320,900, for device for administering anæsthetics, held not infringed.**
   McKesson patent, No. 1,320,900, relating to a device for administering anæsthetics, *held* not infringed.

Appeals from the District Court of the United States for the Western Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit by Jay A. Heidbrink and others against Elmer I. McKesson, in which defendant set up counterclaim. The bill and counterclaim were dismissed, and both parties appeal. Affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

F. A. Whiteley, of Minneapolis, Minn., for appellants and cross-appellees.

George E. Kirk, of Toledo, Ohio, for appellee and cross-appellant.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. These patents relate to devices for administering anæsthetics. Nitrous oxide was commonly used where effectiveness for very short periods was sufficient, as in tooth extraction; but if its administration was long continued it became dangerous. Accordingly a process was developed by which oxygen could be mixed with the nitrous oxide, and a more prolonged use of the anæsthetic became feasible. In practice, the operator procured his gases from prepared tanks, which contained the respective gases at high pressure, and in that form were a market product. It was found that a desirable mixture was approximately in proportion of one part of oxygen to four parts of nitrous oxide, and that this proportion, or such slight variance as the particular patient or the immediate exigencies of the case might require, must be maintained with substantial accuracy. A variation of the oxygen content of as much as 1 or 2 per cent. from the right proportion, might produce a loss of the anæsthesia, or a loss of life.

For the purpose of adjusting proportions to fit the needs of the patient, and for the purpose of maintaining proportions when fixed, and since the relative pressure of the supply tanks might be constantly changing, the anæsthetist had to resort to frequent and perhaps almost continuous manual adjustment of the outlet valves upon the two tanks. The safe use of the method, therefore, required the exclusive attention of a skilled anæsthetist, and even he could judge of the quality of the mixture only by the effect produced on the patient—a judgment sometimes formed too late to be useful. Heidbrink claims to have been the first to devise any apparatus by which the respective pressures of the two gases, in their conduits leading from their supply tanks into the mixing chamber, and thus their respective predetermined flow volumes, could be automatically kept constant, whereby the attention and skill required of the anæsthetist were greatly reduced and the utility of the method much advanced. He also claims that he was the first to produce any device by which, when the volume of the flow from the mixing chamber to the patient was increased at the will of the operator, the existing proportions of the mixture would be automatically maintained. The patents which he thinks secure to him these broad inventions are No. 1,265,910, dated May 14, 1918, and No. 1,309,686, dated July 15, 1919. In the court below he brought suit against McKesson, based upon claims 1 and 2 of the first and claims 6 and 7 of the second. These claims are given in the margin.[1] Heidbrink's application for No. 1,309,686

¹No. 1,265,910.

"1. A gas-administering device having a mixing chamber, means for supplying thereto from independent sources a plurality of gases each under pressure and in fixed proportions at their respective pressures, and means for definitely regulating and determining the aggregate volume of flow

was filed November 23, 1911, and for No. 1,265,910, September 26, 1912. In 1910 McKesson filed application for a patent upon a device for using these two gases to produce anæsthesia, and this application resulted in patent No. 1,028,582, dated June 4, 1912. He also had patent No. 1,028,583, issued June 4, 1912, upon application filed May 1, 1911, covering improvements in one feature of his apparatus. In 1913, having devised further improvements, he filed another application which resulted in patent No. 1,320,900, issued to him November 4, 1919.

Heidbrink's suit, upon his two patents, is based upon the use and sale by McKesson of a device constructed in substantial accordance with McKesson's 1919 patent, with the addition of a device not shown therein but added by him to his commercial machine in 1916. McKesson answered this suit, making all the customary defenses and also setting up, as counterclaims against Heidbrink, the allegations that Heidbrink's commercial machine infringed several of the claims of each of McKesson's three patents. The trial court dismissed the bill and the counterclaim upon the theory that the machines of the two parties were of different types and that neither one infringed the patents of the other. Both parties appeal.

We consider first claims 1 and 2 of Heidbrink's earlier patent, issued upon his later application. For the purposes of this opinion only, we assume that Heidbrink was, as he claims, the first to construct any apparatus by which the predetermined proportions of the mixture would be automatically maintained in spite of an increase in volume of the flow of the mixture to the patient; that he showed operative means of accomplishing this result, both in his earlier and his later applications, whereby he was at liberty to take valid broad claims therefor in the earlier patent to issue; and that this result was exceedingly useful.

Having as elements in such a machine, the respective conduits lead-

of said gases into the mixing chamber at their respective pressures while maintaining said fixed proportions.

"2. A gas-administering device having a mixing chamber, means for supplying thereto from independent sources of supply a plurality of gases each under pressure and in fixed proportions at their respective pressures, means for controlling the respective pressures at which the several gases are delivered to the mixing chamber, and means for definitely regulating and determining the aggregate volume of flow of said gases into the mixing chamber at their respective pressures while maintaining said fixed proportions."

No. 1,309,686.

"6. In a device of the class described, a series of fluid and gas retainers, valves and flexible expansion chambers having connection with said retainers, means operative from the expansion of said chambers for operating said valves to provide a mixture of varying proportion, and an indicator for indicating the proportion.

"7. In anæsthetic apparatus arranged to be equipped with a compressed gas cylinder, a regulating valve in communication with the gas supply from such cylinder, an expansible elastic gas bag constituting a variable pressure reservoir for a relatively large volume of gas at a relatively low pressure in free communication with the gas-administering passages of the apparatus, and means governed by the inflation of such bag for controlling said regulating valve."

ing to the mixing chamber, valves opening therefrom into the mixing chamber, and a discharge passage leading away from the mixing chamber, it is at once obvious that if it is desired to increase the outflow without changing the proportions, there are two methods by which it can be done—though the successful application of either may require invention. One method is to increase the valve openings from the two conduits into the mixing chamber and increase them in proper relation to each other, while the pressure of the respective gases in the respective conduits remains unchanged. Because of the increased valve openings, more of the respective gases will get into the mixing chamber, but in the same proportion, and there will be a larger supply for the outflow. The other is to leave the valve openings into the mixing chamber unchanged, but to increase in proper relative proportion the gas pressure in the respective conduits. By this method, also, more gas, but in the same proportions, will come into the mixing chamber and be ready for the outflow. For simplicity it seems best to assume, as both parties have, that the gas pressures in the two conduits should always equal each other; otherwise the problem of proportioning by valve openings is very complicated. It is not impossible that still a third method may be devised, which would be a combination of the other two, and which would change in unequal proportions both the valve openings and the gas pressures back thereof; but we are not advised that this has been done, and it perhaps presents unsurmountable difficulties. McKesson, by his device with his 1916 addition, obtains this result—increasing outflow while automatically maintaining proportions—by increasing at the operator's will the equal pressure in both conduits leading into the mixing chamber, keeping the valve openings therein unchanged. Heidbrink gets this result, in his device as shown in his later application and (with the possible exception to be noted) in the form shown on his earlier application, by maintaining his equal pressure in the two gas conduits while he enlarges in the same proportion the valve openings from the conduits to the mixing chamber.

[1] With this statement of the situation, we come to his two claims of 1,265,910. We are compelled to think that they are invalid because functional. They are apparently most deliberately and skillfully drafted to cover any means which any one ever may discover of producing the result; that is, to accomplish the one thing while avoiding the other. We think they are clearly to be condemned under the rule stated in O'Reilly v. Morse, 15 How. 62, 112, 14 L. Ed. 601, Risdon v. Medart, 158 U. S. 68, 77, 15 Sup. Ct. 745, 39 L. Ed. 899, and the many familiar cases applying the rule, and that they are not within the principle of the Telephone Case, 126 U. S. 1, 534, 8 Sup. Ct. 778, 31 L. Ed. 863. We do not mean to say that a claim which in a very general way calls for means is necessarily functional and bad—quite the contrary (Davis v. New Departure Co. [C. C. A. 6] 217 Fed. 775, 782, 133 C. C. A. 505); nor would we hastily condemn for this reason, a claim which, by its functional quality, only became equivalent to that valid process claim which the inventor might have obtained through another form of his application; but a claim to a process

which attempted to define the process only by its result, would be no less objectionable than is a corresponding claim to a machine.

For this reason we do not go into the many other questions involved. The decree dismissing Heidbrink's bill as to patent No. 1,265,910 is affirmed.

In his first application (patent No. 1,309,686) Heidbrink undertook to solve the problem of automatically maintaining the predetermined, and preferably equal, pressure in his conduits from supply tanks to mixing chamber by inserting therein an expansible supplementary chamber, with relatively large capacity, intended to hold the gas at a relatively small pressure. The expansible reservoir was in horizontal bellows form. Obviously the weight of the upper portion tended to collapse it, and the internal pressure need be only enough to lift this weight. Extending horizontally from the top of the bellows chamber he had a metallic arm and, upon the nearby frame, upper and lower stops with which this arm would make contact as the top of the bellows arose to its extreme expansion or as it fell a very slight distance, possibly an inch, therefrom. By a very complicated and elaborate system of electric wiring, solenoids and revolving parts he provided that when the arm contacted with the lower stop, the outlet valve from the supply tank should be slightly opened, and as soon as the bellows rose to its upper position, the same valve should be closed. It would result that the bellows would automatically maintain such a gas pressure therein as to keep the top of the bellows between the two stops; that is to say, the internal gas pressure would be automatically maintained at the predetermined point, with only such fluctuations or fluttering as the distance between the two stops might produce. Giving Heidbrink the benefit of all doubts as to operativeness, this is the disclosure upon which his claim 6 is drawn; and it is this electrical system and apparatus which he shows as the "means for automatically controlling the pressure in such reservoir," which is one of the elements of his claim. McKesson departs very far from this disclosure of means. His elastic reservoir, a rubber bag, by its expansion operates one end of a hinged lever arm, and the other end of this arm then directly closes, by a plunger movement, the supply tank outlet valve. As the elastic reservoir collapses, the operation is reversed and the outlet valve is opened. This elastic bag will therefore flutter as Heidbrink's bellows should do, and maintain a practically constant pressure therein.

[2] Upon balancing the considerations affecting the proper construction of this claim 6, the majority of the court concludes that the claim is not rightly capable of such a broad interpretation as to include defendant's device. We have already assumed that Heidbrink's described electrical means were operative—although this is strenuously denied, and is, at least, doubted by part of the court; but before he put his machine on the market or had procured from his single specimen of the bellows apparatus any use that could cause it to be, at the most, little more than experimental, he discarded the whole idea of any such interposed expansible, supplementary reservoir, as being unnecessary, and substituted therefor, as the outlet valve of the supply tank, an ordinary pressure-reducing valve found

upon the market; and by adopting this valve, he solved in a simpler way, as he thought, the whole problem of maintaining constant pressure in this conduit. The pressure-reducing valve has a measure of analogy to the automatically regulated expansible chamber; but the analogy is imperfect. Then came McKesson (accepting, as we do, the District Judge's findings as to priority) and by a simplification of self-regulating means as applied to an elastic bag—itself much older than either party—made the expansible reservoir idea practically a commercial success. However broadly Heidbrink's claim might be read as to variant electrical devices or even closely analogous mechanical devices, we cannot make it cover McKesson's construction; and hence it is not necessary to state the further contentions against infringement, since we conclude that this one must prevail.

We do not overlook, but find no occasion to decide, the controversy whether Heidbrink discloses a "variable pressure reservoir," in the sense and to the extent which would make McKesson's elastic bag and forcing bar an equivalent. Precisely the same considerations determine the controversy as to infringement of claim 7. Its concluding element is "means governed by the inflation of such bag for controlling said regulating valve." Heidbrink's means are electrical, roundabout and dubious; McKesson's means are simple, direct and mechanical; Heidbrink's form has never been commercially used to any substantial extent and was almost at once abandoned by him; McKesson's form has had at least substantial commercial adoption and approval. The majority of the court thinks there is no infringement.

The decree dismissing the bill as to patent No. 1,309,686 is affirmed.

[3] We come now to the contentions of the cross-complaint. McKesson alleges infringement of his patent No. 1,028,582, as to claims 1, 7, 8, 9, 10, and 14. Claim 1 calls for check valves between the sources of supply and the mixing chamber which prevent the flow of any gas through these conduits until the valves are lifted by the suction effect of the inhalation by the patient. Heidbrink does not use these. Claims 7 and 8 are directed particularly to the so-called rebreathing bag, but call, though in more general terms, for these same check valves, and Heidbrink does not have them or their equivalent. This call cannot be minimized; it forms part of the distinction from the earlier art on which these claims must rest. Claims 9, 10, and 14, like claim 1, more specifically require these same check valves.

[4] As to patent No. 1,028,583, infringement is alleged of claims 2, 8, and 9. This patent is directed to a peculiar form of rebreathing bag, the two parts of which telescope in order to adjust its size. Claims 8 and 9 are clearly limited to this telescoping feature which Heidbrink does not use. Claim 2 describes one of these telescoping parts in more general terms; but, in view of the specification, it cannot be read broadly enough to cover the very different adjusting device in that one of Heidbrink's rebreathing bag forms which is said to be an infringement.

[5] As to patent No. 1,320,900, infringement is claimed as to 14 claims, which may be divided into five groups. It is first to be noticed that since the court below held—and we are accepting the holding—

that upon this patent McKesson is confined to his filing date, many of these claims would be anticipated by Heidbrink's patents, if the claims were read as broadly as McKesson now insists. The only matters which can require attention beyond this observation are in those details which are found in the Heidbrink commercial machine and not in his patents. It is sufficient to say that we have reviewed the contentions of McKesson as to all of these claims and are satisfied that, when construed as they must be, no infringement appears.

The decree dismissing the cross-complaint is affirmed.