**ZENITH RADIO CORPORATION,**
Plaintiff,

v.

**RADIO CORPORATION OF AMERICA,**
General Electric Company, and Western Electric Company, Incorporated,
Defendants.

Civ. A. Nos. 1098, 1247.

United States District Court
D. Delaware.

June 28, 1957.

Arthur G. Connolly and Thomas Cooch (of Connolly, Cooch & Bove), Wilmington, Del., Joseph S. Wright, Francis

W. Crotty and Philip J. Curtis, Chicago, Ill., Willis H. Taylor, Jr., R. Morton Adams, Harold A. Traver and Thomas F. Reddy, Jr. (of Pennie, Edmonds, Morton, Barrows & Taylor), New York City, and Thomas C. McConnell (of McConnell, Lutkin & Van Hook), Chicago, Ill., for plaintiff.

Caleb S. Layton (of Richards, Layton & Finger), Wilmington, Del., Stephen H. Philbin (of Fish, Richardson & Neave), John W. Nields (of Cahill, Gordon, Zachry & Reindel), New York City, and Leonard Lyon, of Los Angeles, Cal., for defendant Radio Corp. of America.

John J. Morris, Jr. (of Morris, James, Hitchens & Williams), Wilmington, Del., Thomas Thacher and Delevan Smith (of Simpson, Thacher & Bartlett), New York City, for defendant General Electric Co.

William Prickett, Wilmington, Del., and John E. F. Wood, Henry R. Ashton, John Farley, Wm. Redin Woodward and Robert H. Ware, New York City, for defendant Western Electric Co., Inc.

LEAHY, Chief Judge.

This action is by Zenith Radio Corporation. Defendants are Radio Corporation of America, Western Electric Company and General Electric Company.[1] The complaint seeks a declaratory judgment of non-infringement, invalidity and unenforceability of defendants' pooled patents on the grounds of misuse and violations of the antitrust laws. Additional complaints were filed by Zenith in Civil Actions Nos. 1098 and 1247. The actions were consolidated for trial.

Defendants counterclaimed in all actions and, after amendments and withdrawals of patents, charged infringement of 23 specific patents in the plaintiff Zenith's manufacture, 11 patents being specified by RCA, 8 being specified by

1. Additional defendants, American Telephone and Telegraph Company, Bell Telephone Laboratories, Inc. and Westinghouse Electric Corp. have been named but not served.

For pre-trial history of this litigation, see: D.C.Del., 78 F.Supp. 591, 106 F. Supp. 561, 109 F.Supp. 913, 121 F.Supp. 792, 121 F.Supp. 803, 16 F.R.D. 356, and unreported decisions handed down on July 8, 1949, December 12, 1950, November 15, 1955, December 30, 1955, and March 29, 1956.

Western Electric and 4 by General Electric.

By Pre-Trial Order No. 1, a separate trial of the issues relating to validity and infringement of the patents specified by defendants in their counterclaims was ordered to precede a separate trial of the issues of the unenforceability and misuse of patents.[1a] Pre-Trial Order No. 2 provided trial of the issues of validity and infringement would proceed by designated groups of patents related by subject matter of invention. In short, the patents in suit were broken up into 8 Groups. In essence, this called for 8 separate trials. See D.C.Del., 16 F.R.D. 356.

### Group 1

The first trial of the issues of validity and infringement of the patents in Group 1, relating to Receiver Tuning, has been had. This group comprised Anderson patent No. 1,849,651 owned by defendant, Western Electric Company. Another patent of Group 1, Shea patent No. 2,289,-147, owned by defendant General Electric Company, was dropped since the entry of Pre-Trial Order No. 2. The Anderson patent application was prepared and prosecuted by the Western Patent Department. It was filed October 24, 1924, and was granted March 15, 1932. It expired March 15, 1949. Western charges each of claims 1, 9 and 12 of Anderson patent was infringed by Zenith's manufacture, use and sale of Zenith sets classified in Groups as follows:

Group A: Sets 3, 6, 7, 8, 8C, 8H, 8I, 8J, 9, 10, 11, 12, 12A.

Group B: Sets 1, 2(Z), 4, 8A(Z), 8D, 8E, 8F, 8G, 12B, 12C.

Group C: Sets 2, 5, 8A.

Group D: Sets 13, 16.

Group E: Sets 14, 15.

Group F: Set 20A.

Western charges no infringement of Anderson by Zenith sets 8B, 17, 18, 19, 20. Originally, sets 17, 18, 19, 20 were charged to infringe, but that charge was withdrawn.[2]

Claims 1, 9 and 12 in suit are quoted below.[3]

The questions here involved are:

1. Do the accused Zenith sets infringe claims 1, 9 and 12 of Western Electric's Anderson patent 1,849,651?

1a. Companion litigation, between the parties, raising the issue of misuse of patents and violations of the antitrust laws (issues present in the Delaware litigation, but postponed until validity and infringement issues were to be determined) is before the courts in the 7th Circuit. See, Radio Corp. of America v. Rauland Corp., D.C., 16 F.R.D. 160, the Chicago litigation, and Radio Corp. of America v. Igoe, 7 Cir., 217 F.2d 218; 348 U.S. 968, 75 S.Ct. 543, 99 L.Ed. 754; 348 U.S. 973, 75 S.Ct. 533, 99 L.Ed. 758.

2. R. 722–732.

3. Claim 1. "In a radio receiving circuit containing a plurality of circuits tuned to different frequencies, variable condensers adapted to control the resonant frequency of said circuits, said variable condensers including movable plates of such shape that the resonant frequency of the tuned circuits varies as a straight line function of the angle of rotation of said plates, and a uni-control means for said movable plates."

Claim 9: "In combination, a tuned circuit, a second circuit tuned to a frequency differing from a frequency to which the first circuit is tuned, each of said circuits containing inductance and capacity elements, and movable control means for simultaneously varying the reactance of one of said elements of each tuned circuit, the variable elements being so proportioned that the frequency of the tuned circuits varies as a straight line function of the movement of said control means, to maintain a constant difference between the frequencies to which said circuits are tuned."

Claim 12. "A superheterodyne receiver including a resonant circuit tunable to a signal frequency, an oscillator circuit tunable to a frequency which differs from the signal frequency by a super-audible beat frequency, tuning means for each circuit including an element having a variable electrical value, means for simultaneously varying said tuning means, the said varying means so relatively connecting said tuning means and said variable elements as to maintain said beat frequency a constant."

2. Are claims 1, 9 and 12 of this patent valid?

The Zenith defenses are:

1. Anderson should be viewed with caution, and accorded a narrow construction since amendments were attempts to extend the application to dominate proposals of others in the developing art.

2. Anderson claims 1, 9 and 12 in suit are invalid because they are too broad.

3. Anderson claims 1, 9 and 12 are invalid because of prior art.

4. Anderson is invalid because of disclosure of substantially identical matter by others.

5. Anderson is invalid because he was not the original inventor of the only arrangement described and claimed in the patent as a means for accomplishing its objects.

6. Anderson is limited to the use of a straight line frequency characteristic throughout the entire range as an essential element to secure tracking. The Zenith sets, it is argued in support of non-infringement, do not employ the straight line frequency characteristic to effect tracking.

7. Anderson is limited to the employment of straight line frequency characteristic throughout the entire range to effect tracking by mounting the straight line frequency condensers on a common shaft and angularly displacing them with respect to one another. Zenith sets, it is argued, do not use this arrangement. Hence, they do not infringe.

8. Anderson cannot cover the use of straight line frequency tuning condensers for spreading the stations over the dial. Claims covering this were rejected by the Patent Office, it is argued, and the rejection was acquiesced in, and the claims were thereupon cancelled.

### The Invention in Suit

In 1923, Anderson developed radio receiver circuits and struck out for the invention which is the subject of the patent here in suit.[4] The basic claimed invention relates to the tuning of radio receivers for selecting a desired station.[5]

1. The significance of Anderson's work was it provided single-control tuning for the two tuned circuits in superheterodyne radio receivers. It was aimed to supersede the multiple-control superheterodyne tuning which had been used previously. He recognized the disadvantages, because superheterodyne radio receivers operated differently from receivers of other types. To select certain waves, and reject others, radio receivers included tuned circuits which could be adjusted to be resonant at the desired frequencies. These circuits included one inductance and one condenser. An inductance is a coil of wire. A variable condenser includes two sets of metallic plates. One set is movable, the other stationary. Plates in each set are spaced apart from each other. The movable set, called the rotor, is mounted on a rotatable shaft. Its plates are adapted to enter into the spaces between the fixed plates, when the shaft is rotated by a control knob. Variation of the condenser by turning the control knob varies the amount of overlap or enmeshed area betweeen the fixed and movable plates. This varies the resonant frequency of the circuit associated with it, so that the circuit will select the desired wave.[6]

"Capacitance" of a variable condenser is proportional to its enmeshed area.[7]

2. In early radio, one type of radio receiver, the "tuned-radio-frequency" type, employed several variable tuned circuits, all tuned to the same frequency. To provide a unitary control for such a receiver required only that these tuned circuits be identical, with identical variable condensers mechanically connected together and operated by a single control knob.[8] Another type of radio receiver which preceded the superheterodyne was the "heterodyne". Such receivers were

---

4. Browne, R. 1148–1149.

5. DX 1, p. 1, 11. 1–4.

6. Llewellyn, R. 132–139, 145, 157; DX 5.

7. Llewellyn, R. 133–134, 197.

8. Llewellyn, R. 190.

useful in receiving radio-telegraph code but did not receive speech or music. They employed a circuit tuned to the incoming radio wave to be received, and another tuned circuit which controlled a local oscillator. The oscillator generated a wave which was then mixed with the incoming wave. There was produced, as a result, a difference-frequency wave. The difference-frequency wave had to have some frequency lying within the audible range so the code signal could be heard. One attempt to provide a unitary control for a receiver of this type included an arrangement in which the two tuned circuits were almost, but not quite, identical; and their condensers were mechanically connected together. The result was a variable difference frequency was obtained. As long as this variable difference frequency was in the audible range, the heterodyne type circuit would work and produce an audible code signal.[9]

3. The superheterodyne type receiver has been known since 1919.[10] It is now the type of radio receiver, with the advance of the art, generally used in the home.[11] Superheterodyne receivers include at least three tuned circuits: a radio-frequency tuned circuit, a local-oscillator tuned circuit, and an intermediate-frequency tuned circuit. Each of these circuits is tuned to a different frequency. The radio-frequency circuit is tuned to the frequency of the wave received from the desired radio station. The local oscillator generates a wave within the receiver, and its tuned circuit determines the frequency of this locally-generated wave. This frequency is higher or lower than that to which the radio-frequency circuit is tuned. The locally-generated wave from the oscillator is mixed with the received wave, and there is derived a difference-frequency (intermediate-frequency) wave, having a su-

per-audible frequency, for example, 50,000 cycles per second, or 455,000 cycles per second. The latter frequency is commonly used today.[12]

4. The intermediate-frequency circuit is a "tuned" circuit because it includes an inductance and a condenser which resonate at a certain frequency (the intermediate-frequency) for selecting waves of that frequency and rejecting others. But it is not "tuned" by the user. It is adjusted when the set is built, and is not changed by the user.[13]

5. Requirements for providing a unitary control for a superheterodyne receiver are different and more difficult than for those providing a unitary control for other types. A tuned-radio-frequency receiver is operated with all circuits tuned to the same frequency. A heterodyne receiver can be operated with a variable difference frequency, which must be in the audible range. Since these characteristics differ from those of superheterodyne receivers, tuned-radio-frequency and heterodyne receivers use unitary-control tuning arrangements which have not been used for superheterodyne receivers.[14]

Before Anderson, as was noted, two tuning controls were required for superheterodyne receivers. In such superheterodynes, two separate, manually-operated tuning controls were used, one for tuning the radio-frequency circuit and one for tuning the local-oscillator circuit.[15] To select a station, it was necessary to set two controls in the right combination of positions. An operator would follow this procedure: set the control for one of the circuits, vary the other control back and forth, then reset the first control at successive positions, and repeat the operation until the station was located.[16] This resulted in complexity of the tuning operation. Tuning a two-control superheterodyne was an art,

9. Llewellyn, R. 191, 192, 1194, 1195.

10. Llewellyn, R. 595.

11. Llewellyn, R. 280, 281; Johnson, R. 1118.

12. Llewellyn, R. 149–156, 160; DX 4, 4B.

13. Llewellyn, R. 155.

14. Llewellyn, R. 190–194, 451, 1200.

15. Llewellyn, R. 161–180, 182, 450–455, 595; DX 27–36; DX 26, 43–B, C, E, F.

16. Llewellyn, R. 166, 167.

requiring skill on the part of the operator.[17]

The history of the art called for selection of certain waves and rejection of others by means of tuned circuits. These circuits included one inductance and one condenser. Variation of the condenser by turning the control knob varied "capacitance", which varied the resonant frequency of the circuit associated with it, so the circuit would select the desired wave.[18] In early radio, one type of radio receiver, the "tuned radio frequency" type, employed variable tuned circuits, all tuned to the same frequency for receiving broadcast speech and music.[19] Also another type of radio receiver employed two variable tuned circuits which were combined to give a beat frequency, and was known as the heterodyne.[20] Nevertheless the superheterodyne as a type of receiver was known as early as 1919.[21] Armstrong superheterodyne patent No. 1,342,885,[22] granted 1920, describes his invention as utilizing the heterodyne principle.[23] However, superheterodyne receivers were not put on the commercial market until 1924. Since 1930, it is noted, it is the type of receiver generally used in the home.[24]

6. In paragraph 3, supra, I found superheterodyne receivers have three tuned circuits: 1. a radio frequency tuned circuit; 2. a local-oscillator tuned circuit; and 3. an intermediate frequency tuned circuit, each tuned to a different frequency. The radio frequency circuit is tuned to the frequency of the wave received from the desired radio station. The local oscillator generates a wave. Its tuned circuit determines the frequency of the locally generated wave. This frequency is higher, or lower, than that to which the radio frequency circuit is tuned. The locally generated wave from the oscillator is mixed with the received wave. There is derived a difference frequency (intermediate frequency) wave.[25] After amplification, beat frequency is converted to the original audio frequency of the radio broadcasting station. Then the loud speaker converts the waves to sound. In the superheterodyne receiver the beat frequency tuned circuit remains constant.[26] In the heterodyne receiver it was common to maintain the beat frequency constant when desired.[27]

7. The only receiver built by Western (as far as the evidence discloses) as owner of the Anderson patent, embodying the Anderson unicontrol system, is the Model 7-A receiver which employed two condensers having a straight line frequency characteristic over their entire range "to a very high degree"[28] and which were angularly displaced. In this receiver the condensers were of the straight line frequency type over the entire range. This was in accord with the essential feature of the Anderson unicontrol system.[29] My examination of the documentary proofs would suggest there is lack of disclosure in Anderson of securing unicontrol by relative plate shaping of one condenser with respect to another.[30] Likewise I have looked for disclosure in Anderson of sercuring unicontrol by fixed inductance capacity compensation.[31] *Insofar as unicontrol of a*

17. Llewellyn, R. 230, 231; patent, p. 5, 11. 3–16.

18. Llewellyn, R. 132–139, 145, 157, 197; DX 5.

19. Llewellyn, R. 190, 285–86, 307; Browne, R. 1139–42; Schmied, 523–24; PX 2, pp. 30, 45–9.

20. Llewellyn R. 191–192.

21. DX 26; PX 9W.

22. PX 9W.

23. PX 9W, p. 1, 1s. 93–95.

24. Johnson, R. 1118; Llewellyn, R. 281; see, footnote 11, supra.

25. Llewellyn, R. 149–56, 160; DX 4, 4B.

26. Llewellyn, R. 155.

27. Hammond, PX 9C, p. 2, 1s. 35–6; Kelley, R. 830–31.

28. Llewellyn, R. 625.

29. DX 109, Anderson, et al., Recent Improvements in the Superheterodyne, p. 10; Llewellyn, R. 700–71.

30. Kelley, R. 1052–1054.

31. Kelley, R. 1052–1054.

*superheterodyne radio is concerned, the patent discloses only one specific concept: unicontrol by "angular displacement of condensers" which have a straight line frequency characteristic over the entire range.*[32]

### Zenith's Charged Infringement

8. Relative plate shaping system of unicontrol and the fixed inductance capacity compensation system used by Zenith appear different from the system disclosed by Anderson.[33] Zenith, in its accused receivers 1, 2, 3, 4, 5, 6, 7, 8, 8A, 8C, 8D, 8E, 8F, 8G, 8H, 8I, 8J, 9, 10, 11, 12, 12A, 12B and 12C uses, in fact, the relative plate shaping system of unicontrol.[34] Relative plate shaping system of unicontrol was developed by the art independently of Anderson.[35] Zenith in its accused receivers 13, 14, 15, 16 and 20A uses the fixed inductance capacity compensation system of unicontrol.[36] Likewise, the fixed inductance capacity compensation system of unicontrol as used by Zenith was developed by the art without Anderson.[37] The evidence shows both the relative plate shaping tracking system and the fixed inductance capacity compensation tracking system employed by Zenith are different from the tracking system suggested by Anderson.[38] Zenith does not use condensers with a straight line frequency characteristic over the entire range.[39] Zenith does not use a straight line frequency characteristic to secure unicontrol.[40] Nor does Zenith use angular displacement of its tuning condensers.[41]

Relative plate shaping used by Zenith is the system suggested by Van B. Roberts in his article in 1923; and, in citing Roberts, I do not suggest he anticipated Anderson as an element of prior art. His system is independent of the shape plate used. The only requirement is whatever the shape of one plate, the other shall be correctly shaped, relatively to it. The system has nothing to do with straight line frequency. The accused receivers track just as well below the range asserted by Western to be straight line frequency as above. The system has nothing to do with the displacement of the plates of one condenser with respect to the plates of another.[42] The shape of the condenser plates used by Zenith in the relative plate shaping system of unicontrol does not follow any particular mathematical law. Nothing in Anderson teaches how to derive the plate shape used by Zenith. [43, 43a] The fixed inductance capacity system used by Zenith, as I see it, is independent of straight line frequency characteristic. It uses no displacement of condensers. Any shape of condenser apparently may be used. The only requirement is whatever shape is used for one condenser, the other must be the same. The unicontrol tracking is secured not by condenser shaping but by changes in other parts of the apparatus, e. g., by selecting inductances and adding capacities of appropriate value at appropriate points.[44] There is no teaching in Anderson of how to derive the plate shape used by

32. Kelley, R. 811.

33. Kelley, R. 1022.

34. Kelley, R. 969–73.

35. Johnson, R. 1094–95; Kelley, R. 1022.

36. Kelley, R. 980–82.

37. Johnson, R. 1094–95.

38. Kelley, R. 1052–54.

39. DX 19, PX 42–B; Llewellyn, 728–32.

40. Kelley, R. 953, 973, 983, 1015–22.

41. PX 28–I–5; Kelley, R. 1021–22.

42. Kelley, R. 1021–22, 973; Llewellyn, R. 764–5; Llewellyn, 400–403; PX 28–I–5.

43. Llewellyn, R. 398, 400.

43a. Prior to the present litigation with respect to Zenith's receivers and when the Anderson application was in interference with a Moulton application and Western was trying to establish Moulton had nothing in common with Anderson, Western took the position Moulton's system of unicontrol, which depended on the relative shape of the condenser plates rather than their actual shape, was, different from Anderson. This is directly contrary to Western's present position with respect to the Zenith receivers. PX 4, Paper 10, p. 3.

44. Kelley, R. 862–3, 983; Llewellyn, R. 764–5.

Zenith in its fixed inductance capacity compensation system.[45] Upon review of the art, this fixed inductance capacity compensation system used by Zenith had its genesis in the work of Hogan and makes use of adjustments found in Hogan, Bucher, and McLaughlin. The details of the system are explained in the specification of expired General Electric Company Carlson patent which distinguishes the system from the angular displacement system.[46]

In the accused receivers any evidence of the straight line frequency characteristic is used solely for the purpose of convenient station spreading and the unicontrol system does not depend upon its presence.[47]

A reading of Claims 1, 9 and 12 on the Zenith apparatus does not establish the Zenith apparatus utilizes any invention of Anderson. The fact Zenith accused receivers are unicontrol superheterodyne receivers does not prove they use the system of unicontrol disclosed by Anderson. The fact Zenith receivers in groups A, B and C use condenser plates in which the enmeshed area in the local oscillator circuit is different from the enmeshed area in the condenser in the radio frequency circuit, does not establish these sets use the Anderson system of unicontrol. The same is true of Zenith model 8B unicontrol superheterodyne which is not accused as an infringement.[48] Since in the Zenith sets of groups D, E and F the use of different inductances produces the same frequency difference effect, as does Anderson's use of different capacitance values, and since these sets are tuned the rate of change of total capacitance effective in tuning the radio frequency and local oscillator circuits is different by an

amount sufficient to maintain tracking does not establish these sets utilize Anderson's single-control system. This is also true of Zenith's unicontrol superheterodyne models 17, 18, 19, and 20 which are not charged to infringe.[49]

A straight line frequency characteristic is not critical with securing unicontrol in the Zenith receivers. This is confirmed by the fact non-accused Zenith model 8B receiver has the same unicontrol system as the accused receivers in groups A, B and C, and tracks just as well. It does not embody any straight line frequency characteristic at all.[50]

The fact a straight line frequency characteristic has nothing to do with securing unicontrol in the Zenith receivers is confirmed by Zenith models 17, 18, 19 and 20, which are unicontrol superheterodynes, but are not accused, although they use the straight line frequency characteristic over some portions of their range.[51]

9. An analysis of the evidentiary facts shows the Zenith sets do not use the unicontrol system disclosed in Anderson. Hence, there is no infringement. True, Zenith uses in some receivers [52] a relative plate shaping tracking system, and in others [53] a fixed inductance capacity compensation tracking system. But it does not use angular displacement of straight line frequency condensers mounted on a common shaft, the system disclosed in Anderson.

As Johnson indicated in his testimony,[54] the art developed both a relative plate shaping system and a fixed inductance capacity compensation system of unicontrol, and put them into use, independently of anything Anderson had suggested. Anderson produced no effect

45. Kelley, R. 943–961; Llewellyn, 398, 400.

46. Kelley, R. 1045–1048; PX 9–B; PX 9–L; PX 9–K.

47. Kelley, R. 973, 982.

48. Kelley, 1075–6; Llewellyn, R. 1286–7.

49. Kelley, R. 1047–52; Llewellyn, 1228–29.

50. Kelley, R. 966–73; 975–82; 1073.

51. Llewellyn, R. 729–732; Kelley, 980–982.

52. DX 18—Groups A, B, C.

53. Groups D, E, F.

54. R. 1094–5.

whatever on this phase of the art. His suggestions were not published; the patent did not issue until after the art had developed independently; the only two pieces of apparatus ever built using his system (Model 7-A receiver) were held by Western and, even after the art did learn of his suggested angular displacement system by the issuing of his patent, no one, as far as the record before me discloses, ever used it.

Relative plate shaping used by Zenith is, as I stated before, the system suggested by Van B. Roberts in his article in 1923.[55] As Kelley pointed out, the system is independent of what shape plate is used.[56] The requirement is, whatever the shape of one plate, the other shall be correctly shaped relatively to it. The system is one which has nothing to do with straight line frequency. It is independent of whether straight line frequency is used or not. The accused receivers themselves admittedly track just as well below the ranges asserted to be straight line frequency as above.[57]

Zenith is a different system from Anderson's and independent of the concept of Anderson, i. e., reliance upon condensers which give a straight line frequency characteristic throughout the operating range which makes it possible to effect tracking by angular displacement of one condenser with respect to the other. These are the master facts: 1. Zenith sets do not have angularly displaced condensers; 2. their condensers do not have a straight line frequency characteristic over the whole range; 3. the characteristics of Zenith condensers and their difference from a straight line frequency characteristic is shown on plaintiff's curve charts;[58] and 4. described by Kelley as "meandering" and "not in accordance with any particular mathematical law." [59] Defendant's Llewellyn admitted outside of the ranges he considered straight, the condensers followed no mathematical law.[60], [61]

10. Again, the fixed inductance capacity compensation systems used by Zenith are independent of straight line frequency characteristics and use no displacement of condensers. Any shape of condenser may be used in the fixed inductance compensation system. The only requirement is whatever shape is used for one condenser, the other must be the same.[62] Tracking is secured not by condenser shaping but by changes in other parts of the apparatus, i. e., by selecting inductances and adding capacities of appropriate value at appropriate points.[63] This system already appeared in the early work of Hogan and makes use of tuned circuit adjustments found in Hogan,[64] Bucher [65] and McLaughlin,[66] as described by Kelley.[67] Details of the system are explained in the specification

55. Kelley, R. 1022.

56. R. 973.

57. Llewellyn, R. 400–403.

58. PX 28 D1, E1 and F1; R. 943–961.

59. R. 953–4.

60. R. 398, 400.

61. Difference between the relative plate shaping system used by Zenith and the system devised by Anderson was made evident by Western at a time when it served its purpose, i. e., in the interference with Moulton, when Western tried to establish Moulton and Anderson had nothing in common. Western said in its Patent Office brief (PX 4, Paper 10, p. 3) :

"In the system disclosed in the Moulton application [PX15] the condenser of one circuit, for example the input circuit may be of any desired type, and the condenser of the other circuit so shaped that as the condensers are simultaneously adjusted, the frequency difference remains constant. In other words, Moulton depends on the relative shape of the condenser plates rather than their actual shape while Anderson depends on the actual shaping of the condensers and their relative [angular displacement] connection."

62. Kelley, R. 983; Llewellyn, R. 764–5.

63. Kelley, R. 862–3; Llewellyn, R. 764–5.

64. PX 9B.

65. PX 9L.

66. PX 9K.

67. R. 1045–6.

of expired General Electric Company Carlson patent,[68] also discussed by Kelley.[69] In the Carlson specification the system is distinguished from the angular displacement system of Anderson.[70]

11. Western's position on infringement is, at bottom, based on claim language. Western has difficulty in denying Zenith uses the relative plate shaping system and the fixed inductance capacity compensation system; or that these were systems devised entirely independent of Anderson. Likewise, Western has the same difficulty in denying these systems do not depend on angular displacement of condensers, and do not depend on utilization of straight line frequency characteristics.

12. Defendant's position seems to be the claims can be "read on" Zenith's apparatus and that this establishes infringement. The law is otherwise.[71]

These two features of superheterodyne and unicontrol are the two features in claim 12, and the ability of Western to read this claim on Zenith's apparatus results solely from the fact the claim would be too broad if considered to include the Zenith structures. In reading claims 1 and 9 on the Zenith apparatus, Western takes the step of "finding" a straight line frequency characteristic in the Zenith apparatus. This does not establish infringement for Western does not find, as it must, a straight line frequency characteristic is made use of to secure Zenith's tracking.

The fact the tracking system of Zenith sets is independent of a straight line frequency characteristic, is apparent

---

68. PX 9R.

69. R. 1046–1052.

70. The specification says (p. 4, 1s. 114–127):
"Thus it will be seen that by providing the circuit arrangement of the present invention, a simple unicontrol tuning condenser means or unit may be employed to tune one or more circuits to the same frequency and one or more circuits associated therewith to a different frequency over a wide range of frequencies, thus eliminating the necessity for condensers of special shape, such as those of the straight line frequency type heretofore used, and an angularity adjustment between each condenser or other mechanical expedient for setting up the frequency difference."

71. In Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136, it was said:
"* * * The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent."
This rule has been applied both in this Circuit and in this Court.
In Complete Calculator Co. v. Monroe Calculating Mach. Co., D.C.Del., 4 F. Supp. 842, 847:

"Conceding that the claims in suit may be read on the mechanism of the defendant's machines, it is now well settled that this is not enough to establish infringement. 'It must be determined that the device of the defendant is not merely in words but in fact the invention of the patent.' Elevator Supplies Co. v. Graham & Norton Co., 3 Cir., 44 F.2d 354, 355; Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 568, 569, 18 S. Ct. 707, 42 L.Ed. 1136."

The Court of Appeals in Elevator Supplies Co. v. Graham & Norton Co., 3 Cir., 44 F.2d 354, after quoting from Westinghouse v. Boyden with approval said (at page 356):

The question of infringement should be approached: "not merely with the word 'means' in our mind but with our eyes on what Norton [Anderson], in his specification, said in his invention."

As stated in Marconi Wireless Tel. Co. v. Kilbourne & Clark Mfg. Co., D.C., 239 F. 328, at page 354; affirmed 9 Cir., 265 F. 644, the Court said:

"The mere fact that the same result is obtained by the operation of an apparatus is not conclusive of infringement. Infringement cannot be predicated on results obtained, irrespective of the apparatus employed. The fact that the apparatus of the plaintiff, by 'broad tuning,' and the apparatus of the defendant in normal operation, secure the same result, does not signify infringement."

from the fact the tracking systems are independent of any such characteristic. It is important there are Zenith sets which are *not* accused and which use the *same* tracking system as those that *are* accused.[72] It would appear non-accused sets differ from those accused solely because Western is unable to find in the former any resemblance to a straight line frequency characteristic at all,[73] or, at least, insufficient straightness.[74] Yet they tracked just as well.[75]

Zenith tracking systems are apart from anything shown in Anderson. The fact they respond to the broad language of the claims results from the circumstance the claims are, in the words of Heidbrink v. McKesson, 6 Cir., 290 F. 665, 668, 669:

" * * * most deliberately and skillfully drafted to cover any means which any one ever may discover of producing the result; * * * "

The rule to be applied, here, it seems to me, is the rule the Court of Appeals in this Circuit applied in Standard Oil Development Co. v. James B. Berry Sons Co., 3 Cir., 92 F.2d 386. In that case, after noting the patented invention had never gone into use, the Court quoted with approval from the decision in Lovell v. Seybold Mach. Co., 2 Cir., 169 F. 288, at page 290:

"It would, however, be grossly unfair to compel the builder of a practical working machine to pay tribute to one who has added nothing of substantial value to the art, simply because the language of his claims is broad enough to include the successful structure."

13. Certain questions as to admissibility of evidence were raised at trial. They related, among other questions, to interference proceedings. At trial, I withheld decision on admissibility. I now rule such evidence is admissible.

In passing, I state such had little, if any, probative value. There was no harm in my looking at these writings. They were not persuasive for the decision of the case at bar.

### As to Validity

14. Anderson describes a unitary superheterodyne tuning control with a constant difference frequency. He speaks of variable tuning condensers mounted on and simultaneously controlled by the turning of a common shaft and operated by a single control. He describes a method to use straight-line-frequency tuning specifically in a unitary superheterodyne tuning control. He gives mathematical formulae for constructing variable condensers. I shall not pause to recite the detail of his teaching.[76] Anderson describes angular displaced condensers. He speaks of two identical condensers of the straight-line-frequency tuning type—one for the radio-frequency circuit and one for the local-oscillator circuit, both condensers being mounted on a common shaft with the rotor angularly displaced with respect to those of the other.

He claims this arrangement has advantages and suggests certain disadvantages. He also claims the effective date of his invention was as early as April 1924. After a careful review of the prior art (Zenith relied upon more than 40 patents and publications), Zenith finally brought into sharp focus Hogan 1,363,319, Hammond 1,484,605, and the publication of Van B. Roberts. Both Hogan and Hammond were before the Patent Office. Yet Anderson was awarded the patent in suit. This would carry an additional burden for Zenith in its attack on validity. Metals Disintegrating Co. v. Reynolds Metals Co., D.C. Del., 130 F.Supp. 227, 237. The Van B. Roberts article (Radio Broadcast,

---

72. Set 8–B—relative plate shaping—Kelley, R. 964; Sets 17–20—fixed L–C compensation—Kelley, R. 975.

73. Set 8–B—relative plate shaping—Llewellyn, R. 728.

74. Sets 17–20 fixed L–C compensation—Llewellyn, R. 729–732.

75. Llewellyn, R. 728–30.

76. See, footnote 3, supra.

April 1923, pp. 340–46, PX 9D) did not involve a unicontrol set, but employed two independent tuning controls. The citation of the McLaughlin publications does not bolster the prior art as against Anderson. I shall not pause to discuss the condenser prior art cited against the patent in suit. In short, it was not persuasive. Neither shall I give any further consideration as to whether "angular displacement" was invented by Leek, Anderson's attorney, and not by the latter himself. I find a failure of proof of invalidity of the Anderson patent. He made a patentable contribution to the radio art. Throughout the life of his patent I find it to have been a valid one. But for the findings and reasons already set forth and discussed, I do not think Zenith has been an infringer of Anderson because its structures and their functions are outside the Anderson patent. Therefore the

Conclusions of Law

are:

1. This Court has jurisdiction of the subject matter of this action and of the parties Zenith Radio Corporation and Western Electric Company, Inc.

2. Anderson patent No. 1,849,651 (now expired) was throughout its life a valid patent, including specifically Claims 1, 9 and 12.

3. Zenith radio receiving sets Nos. 1, 2, 2(Z), 3, 4, 5, 6, 7, 8, 8A, 8A(Z), 8C, 8D, 8E, 8F, 8G, 8H, 8I, 8J, 9, 10, 11, 12, 12A, 12B and 12C did not infringe Anderson patent No. 1,849,651 or Claims 1, 9 and 12.

4. Zenith radio receiving sets Nos. 13, 14, 15, 16, and 20A did not infringe Anderson U. S. Patent No. 1,849,651 or Claims 1, 9 and 12.

5. The counterclaim of Western Electric Company, Inc., for infringement of Anderson patent No. 1,849,651 will be dismissed.

An order in accordance with the foregoing may be submitted.